In re AMERICAN SPRING BED MANU-
FACTURING COMPANY d/b/a Ameri-
can Chain Link Fence Company, Debt-
or.

UNITED STATES TRUST COMPANY,
Plaintiff and Defendant-in-
Counterclaim,

v.

RARITAN RIVER STEEL CO., INC., Cy-
clone Fence, a division of USX Corpo-
ration and Paul Grella, Trustee, Defen-
dants, Plaintiffs-in-Counterclaim, Third
Party Plaintiffs,

v.

AMERICAN CHAIN LINK FENCE CO.,
INC. and Century Tube Corporation,
Third Party Defendants.

Bankruptcy No. 92–18538–JNF.
Adv. No. 92–1604.

United States Bankruptcy Court,
D. Massachusetts.

April 23, 1993.

David J. Reier, Boston, MA, for trustee.

Bertin C. Emmons, Boston, MA, for U.S. Trust Co.

Richard L. Campbell, Cambridge, MA, for Cyclone Fence.

Donald R. Peck, Boston, MA, for American Chain Link Fence Co.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

Five motions are before the Court. Three motions were filed by the third party defendants (erroneously identified in the pleadings as defendants-in-counterclaim), American Chain Link Fence Co., Inc. ("ACL") and Century Tube Corporation ("Century"), and comprise the following: "Motion to Dismiss Trustee's Fraudulent Conveyance Count for Failure to Comply with Rule 7009, or in the Alternative, for a More Definite Statement;" "Motion to Dismiss Counterclaim [sic] of the Chapter 7 Trustee or, in the Alternative, for Summary Judgment;" and "Motion to Dismiss Counterclaim [sic] of Raritan River Steel Co., Inc. or, in the Alternative, for Summary Judgment." The plaintiff in this action, United States Trust Company ("UST") filed the remaining two motions, one for

summary judgment against defendant Raritan River Steel Co., Inc. ("Raritan") and the other against Cyclone Fence, a division of USX Corporation ("Cyclone").

The filing of these motions and the plethora of oppositions, affidavits and memoranda filed in association with them were precipitated by the filing of an involuntary petition under Chapter 7 against American Spring Bed Manufacturing Company d/b/a American Chain Link Fence Company (the "Debtor") on August 18, 1992, and by UST, on September 9, 1992, when it filed a "Complaint to Determine Validity Priority and Extent of Security Interest," naming Raritan, Cyclone and the Chapter 7 Trustee (the "Trustee") as defendants.

In its complaint, UST alleges, *inter alia*, that it held a perfected security interest in all the Debtor's inventory, goods merchandise, materials, raw materials, goods in process, finished goods, packaging and shipping materials and other tangible personal property including after acquired property and proceeds, to secure an indebtedness of $2,333,728.38. UST further alleges that Cyclone and Raritan sold goods for resale to the Debtor in the spring and summer of 1992; that Cyclone and Raritan filed complaints in the state court in which they asserted an interest in the goods they sold to the Debtor; and that on August 6, 1992, the Debtor sold all its inventory, excluding the Cyclone and Raritan inventory, and applied the proceeds of the sale to pay in part its indebtedness to UST, leaving a balance of $271,722.38. UST also alleges that it sold the Cyclone and Raritan inventory for $231,188.75 and is holding the proceeds in escrow. UST, through its complaint, seeks an order from this Court declaring that its interest in the Debtor's inventory and any proceeds from the sale of the Cyclone and Raritan inventory is valid, perfected and a first priority security interest (and superior to any other interest) to the extent of the Debtor's outstanding obligations. UST also seeks release of the funds in escrow.

Cyclone, Raritan and the Trustee filed answers to UST's complaint, and asserted numerous affirmative defenses. Raritan raised six affirmative defenses: 1) failure to state a claim upon which relief can be granted; 2) lack of good faith; 3) equitable subordination; 4) estoppel; 5) receipt of a preference; and 6) priority of reclamation rights. Cyclone raised the reclamation defense as well as affirmative defenses based upon lack of title or voidable title and failure to give new value. Additionally, Raritan and the Trustee filed counterclaims against UST, and third party claims against ACL and Century. The Trustee and Raritan each filed virtually identical Statements of Claims in their counterclaims and third party claims. They aver that UST knew the Debtor was insolvent during the year prior to the commencement of the involuntary, that UST engaged in a course of conduct to improve its position at the expense of Raritan and unsecured creditors, that UST participated in negotiations for the sale of the Debtor's business to Century, acting as lender to both buyer and seller, and that UST acted in concert with ACL and Century to enable the Debtor's business to continue as if the sale had not occurred.

Based upon these allegations, Raritan formulates two counts: a reclamation count against UST, in which it asserts its rights to the inventory it supplied the Debtor are superior to the rights of UST, and a successor liability count against ACL, in which it asserts ACL is a "mere continuation" of the Debtor and, consequently, a successor to the Debtor's liabilities. Based upon the same allegations, the Trustee asserts five counts: 1) a preference count against UST; 2) an equitable subordination count against UST; 3) a fraudulent conveyance count against ACL and Century; 4) a successor liability count against ACL and Century; and 5) a preference count against ACL and Century. The motions filed by UST, ACL and Century now before the Court are in response to the affirmative defenses, counterclaims, and third party claims.

## II. FACTS

Many of the relevant facts are not in dispute. On or about October 17, 1989, the Debtor signed, among other documents, a security agreement in which it granted

UST a security interest in certain assets, including "all of its [the Debtor's] inventory, goods, merchandise, materials, raw materials, goods in process, finished goods, packaging and shipping materials and other tangible personal property now owned or [t]hereafter acquired and held for sale or lease...." UST perfected its security interest in the collateral by filing financing statements with the Secretary of State's Offices for the Commonwealth of Massachusetts, the State of Connecticut and the State of New York, as well as with various town clerks. In reliance upon the security interest, UST established a revolving line of credit in favor of the Debtor in the maximum amount of $3,000,000. UST made loans and advances based upon 80% of the face value of eligible accounts receivable (under 120 days old) and up to 50% of the cost value of the Debtor's inventory. UST made loans and advances to the Debtor through August 6, 1992, at which point it was owed $2,333,728.38.

Between June 16, 1992 and early July 1992, Raritan sold and delivered wire rod to the Debtor for purpose of resale. Raritan did not perfect a security interest in the inventory prior to the dates on which UST perfected its security interest.

Between May 28, 1992 and June 16, 1992, Cyclone sold and delivered 13,500 posts to the Debtor for purpose of resale. The total purchase price was $117,585.00 with payment due within 30 days of delivery. Cyclone did not perfect a security interest in the inventory prior to the dates on which UST perfected its security interest.

Due to the Debtor's inability to collect its account receivable and resulting inability to borrow under its revolving line of credit with UST, the Debtor decided to sell its assets and began negotiating with Century, one of its creditors. On July 24, 1992, the Debtor, ACL and Century executed an Asset Purchase Agreement. On the same day, ACL complied with the Massachusetts Bulk Sale Law, Mass.Gen.Laws Ann. Ch. 106, §§ 6–101–6–110 (West 1990), by mailing notice of the impending asset transfers to all the Debtor's creditors shown on a sworn list provided by the Debtor.

The Asset Purchase Agreement, which was executed by the Debtor, ACL, and ACL's parent, Century, provided:

1. *Purchase and Sale of Business Assets.* Subject to and upon the terms and conditions set forth in this Agreement, Seller will sell, transfer, convey assign and deliver to Purchaser, and Purchaser will purchase, at the Closing (as defined in Section 3 below) hereunder, all of the business, assets, properties, goodwill and rights of seller as a going concern, of every nature, kind and description, tangible and intangible, wheresoever located and whether or not carried or reflected on the books and records of Seller (hereinafter sometimes collectively called "Seller's Assets"), and including, without limitation, all of Seller's inventory on hand as of the Closing Date (as hereinafter defined) all accounts and notes receivable existing at the Closing date, land, buildings, improvements, machinery and equipment, supplies, vehicles, fixtures, deposits, prepaid expenses, contract rights, the name American Chain Link Fence Company, the good will associated therewith, all trade names, trademarks, brand names, patents, know-how and other intellectual property, licenses, permits, business records, customer lists, trade secrets, and any other assets used in Seller's business excluding only (A) the minute books, corporate seal and stock records of Seller, and (B) cash on hand as of the Closing Date. Seller's Assets shall be conveyed free and clear of all liabilities, obligations, liens and encumbrances excepting only those liabilities and obligations which are expressly to be assumed by Purchaser hereunder as set forth in Schedule 1(a) hereto and those liens and encumbrances securing the same which are set forth in Schedule 1(b) hereto.

The letter dated July 24, 1992, which was executed by the Debtor's principal and forwarded to all creditors in accordance with the Article Six of Massachusetts' version of the Uniform Commercial Code dealing with bulk transfers, was attached to the Asset Purchase Agreement. It outlined the amount and nature of the Debtor's secured

and unsecured debts, and contained the following statement:

The Corporation will pay from the sale proceeds the existing secured debt as set forth above. There will be insufficient funds to pay in full unsecured creditors. The proceeds from the sale, remaining after the payment of secured debt, taxes and payroll will be delivered to Gary W. Cruickshank, Esq. to be held in escrow and distributed to the unsecured creditors on a pro rata basis. It is anticipated that this distribution will be made within 45 days of the closing. Since the purchase price is being determined by the level of inventory and accounts receivable on the date of the closing, it is impossible to predict, with certainty, the amount of the pro-rata dividend which will be paid to the unsecured creditors.

In addition to the Asset Purchase Agreement, the Debtor and ACL entered into an Assignment and Assumption Agreement (the "Assumption Agreement") dated August 5, 1992. It provided for the assumption of certain liabilities set forth in Exhibit A to the Assumption Agreement. Paragraph 6 of the Assumption Agreement further provided:

6. Other than as specifically stated hereinabove, Assignee assumes no debt, liability or obligation of Assignor, and it is expressly understood and agreed that all debts, liabilities and obligations not assumed hereunder by Assignee shall remain the sole obligations of Assignor, its successors and assigns, and no person, firm or corporation other than Assignor shall have any rights under this Assignment and Assumption Agreement or the provisions contained herein.

In separate state court actions commenced in Massachusetts Superior Court, Norfolk Division, Raritan and Cyclone each attempted to obtain an injunction prohibiting the Debtor from selling inventory they sold to the Debtor, and in the case of Raritan, from selling any of the Debtor's assets. Both complaints contained replevin counts. Raritan alleged that it received a written misrepresentation of the Debtor's solvency in the form of the Debtor's December 31, 1993 financial statements that were transmitted to it on or around April 16, 1992. Cyclone alleged that it first learned that the Debtor was insolvent when it received notice of the bulk transfer. Cyclone did not contend that it ever made a written request for reclamation of the goods it sold to the Debtor. The Superior Court, on August 5, 1992, allowed the sale to proceed but enjoined the Debtor from selling the wire rod and galvanized posts sold to the Debtor by Raritan and Cyclone, respectively.

On August 6, 1992, the Debtor sold all its assets in a bulk sale to ACL, except for the Raritan and Cyclone inventory and certain real estate in Wallingford, Connecticut. The Debtor used the proceeds of the sale to pay its indebtedness to UST, leaving a balance of $271,722.38 owed to UST.

On August 18, 1992, Raritan and two other creditors filed an involuntary petition against the Debtor. UST filed a motion for relief from the automatic stay seeking authority to sell the Raritan and Cyclone inventory. The motion was allowed by the Court (Goodman, J.) subject to two conditions: 1) that proceeds from the sale of the disputed inventory be held in escrow until further order of the Court, and 2) that interests in the inventory attach to the proceeds in the same order of priority as would exist under state law. Accordingly, UST conducted a secured party sale of the Raritan and Cyclone inventory and realized proceeds of approximately $143,000.

III. STANDARDS FOR DISMISSAL AND SUMMARY JUDGMENT

A. Dismissal

In deciding a motion to dismiss, the Court must accept the truth of all well pleaded factual allegations contained in the complaint. The plaintiff, in this case the third party plaintiffs, the Trustee and Raritan, must be given the benefit of all reasonable inferences. A motion to dismiss must be denied unless it appears that the plaintiff can prove no set of facts in support of its claim that would entitle it to the relief sought. *See Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59

(1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Summary Judgment

■ Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Fed.R.Bank.P. 7056, provides that summary judgment shall be rendered in favor of a party "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden of proof is on the moving party to demonstrate the lack of a genuine issue of material fact. The moving party bears the "initial responsibility" of asserting the basis for this motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, the movant is not required to negate his opponent's claim with affidavits or similar materials. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552. The movant may discharge his burden by merely "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

■ In order to defeat any motion for summary judgment, the opposing party must produce substantial evidence of a genuine dispute as to a material fact. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). "A material issue is one which affects the outcome of the litigation. To be considered

'genuine' for Rule 56 purposes a material issue must be established by 'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Id. quoting, First National Bank of Arizona v. Cities Service Co. Inc.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

## IV. UST'S MOTIONS FOR SUMMARY JUDGMENT

### A. Raritan

■ Based upon the pleadings, affidavits, and exhibits, the Court finds that there are no genuine issues of material fact and the motion is ripe for summary judgment. *See* Fed.R.Bankr.P. 7056 and Section III of this memorandum. UST has a valid, perfected security interest in the Debtor's inventory. Under the Uniform Commercial Code adopted in Massachusetts, when the Debtor acquired Raritan's wire rods (and Cyclone's posts) under a contract of sale, it acquired sufficient rights in the collateral for UST's security interest to attach. *See* Mass.Gen.Laws Ann. Ch. 106, § 9–203 (West 1990).

■ Raritan argues in its fifth affirmative defense and in its counterclaim against UST that its rights as a reclaiming seller give it priority in the inventory it sold to the Debtor over UST's security interest in the Debtor's inventory and that UST's interest is superior to its interest only if UST is a good faith purchaser. Even assuming that Raritan has the rights of a reclaiming seller pursuant to Mass.Gen.Laws Ann. Ch. 106, § 2–702[1] and 11 U.S.C. § 546(c)[2], its

---

1. Section 2–702 provides:

§ 2–702. Seller's Remedies on Discovery of Buyer's Insolvency
(1) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article (section 2–705).
(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation

does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.
(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under this Article (section 2–403). Successful reclamation of goods excludes all other remedies with respect to them.
Mass.Gen.Laws Ann. ch. 106, § 2–702 (West 1980).

2. Section 546(c) provides the following:

contention is without merit. A seller's rights to reclaim under either § 2–702 or § 546(c) are subject to the rights of a lien creditor with a perfected security interest in inventory. Mass.Gen.Laws Ann. Ch. 106, § 2–702(3); *In re Lawrence Paperboard Corp.*, 52 B.R. 907 (Bankr.D.Mass. 1985). A prior perfected lien creditor is regarded as a good faith purchaser (the definition of which includes taking by lien), whose rights are superior to those of a reclaiming seller. *In re Diversified Food Service Distributors, Inc.*, 130 B.R. 427 (Bankr.S.D.N.Y.1991); *In re Lawrence Paperboard Corp.*, 52 B.R. 907 (Bankr. D.Mass.1985); *In re FCX, Inc.*, 62 B.R. 315 (Bankr.E.D.N.C.1986); *In re Daley, Inc.*, 17 U.C.C.Rep. 433 (Bankr.D.Mass.1975).

■ In the present case, it is uncontroverted that UST has a valid inventory lien and that Raritan has at most the status of a reclaiming seller. Raritan has not offered any evidence that UST's inventory lien is invalid. The issue of whether UST was a "good faith purchaser" is irrelevant because UST *is* a lien creditor (the term "good faith" does not modify the term "lien creditor" in Massachusetts' version of § 2–702(3)). Even if UST were not a good faith purchaser because of subsequent conduct with respect to the Debtor's assets, the validity of its inventory lien and its priority senior to Raritan would be unaffected. Accordingly, Raritan's interest is subordinate to that UST.

UST briefed the remaining affirmative defenses raised by Raritan, including failure to state a cause of action, equitable subordination, estoppel, and receipt of a preference. In view of Raritan's failure to either substantiate its defenses or respond to UST's arguments and due to the patent lack of viability of these defenses (with the exception of the equitable subordination defense which is the subject of a counterclaim by the Trustee), the Court shall allow UST's motion for summary judgment with respect to Raritan's first, second, fourth, fifth and sixth affirmative defenses and Count I of its counterclaim against UST.

**B. Cyclone**

Based upon review of UST's motion for summary judgment, the agreed exhibits introduced at the hearing on March 4, 1993, the Court finds that there is no genuine issue as to any material facts and that UST is entitled to summary judgment against Cyclone. *See* Fed.R.Bankr.P. 7056 and Section III above.

Cyclone has no security interest in any of the Debtor's assets. It did not make a written demand for reclamation upon the Debtor within ten days of the Debtor's receipt of the inventory. Moreover, the Debtor made no *written* misrepresentation of solvency to Cyclone within three months before delivery of the inventory. Nevertheless, Cyclone claims an interest in the Debtor's inventory as a reclaiming seller. It also asserts that the Debtor obtained no title or voidable title to its inventory as a result of unspecified acts of fraud, that UST is not entitled to the proceeds from the sale of its inventory because UST never gave new value for the interest it acquired in the goods sold by Cyclone to the Debtor, and that UST's security interest should be equitably subordinated.

■ Cyclone does not have a valid right of reclamation because it did not fulfill the conditions of either section 2–702 of the Uniform Commercial Code or section 546(c) of the Bankruptcy Code. It made no written demand within ten days of delivery. Its only "demand" was the commencement of a civil action on July 30, 1992. Cyclone has conceded that the Debtor did not make any written representations of solvency to Cyclone within thirty days so as to obviate the necessity of a ten day demand.

(c) Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but—
 (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor....
11 U.S.C. § 546(c).

Even if Cyclone had a valid right of reclamation (which it did not), its interest would be subordinate to UST's rights as the holder of a valid security interest in inventory for the same reasons that Raritan's interest is subordinate to that of UST. *In re Coast Trading Co., Inc.*, 744 F.2d 686 (9th Cir.1984); *In re Diversified Food Service Distributions, Inc.*, 130 B.R. 427 (Bankr.S.D.N.Y.1991); *In re Lawrence Paperboard Corp.*, 52 B.R. 907 (Bankr. D.Mass.1985).

Cyclone's remaining affirmative defenses and arguments also are devoid of merit. Notably, Cyclone failed to plead fraud with particularity as required by Fed.R.Bankr.P. 7009. Moreover, since Cyclone relies upon the opposition and memorandum of Raritan to UST's motion for summary judgment, Cyclone's opposition is resolved in the context of these pleadings. For these reasons, UST's motion for summary judgment against Cyclone is granted.

In view of the Trustee's pending preference and equitable subordination counts against UST, the Court shall not at this time order the turnover of the proceeds from the sale of the Raritan and Cyclone inventory to the UST.

## V. ACL'S MOTION TO DISMISS TRUSTEE'S FRAUDULENT CONVEYANCE COUNT FOR FAILURE TO COMPLY WITH RULE 7009, OR IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

Resolution of ACL's motion requires close scrutiny of the "Trustee's First Amended Counterclaim [sic]." In his amended counterclaim, which properly should be captioned a third party complaint, the Trustee makes the following allegations pertinent to ACL in his Statement of Claims:

11. Sometime prior to mid-July, 1992, the Debtor entered into negotiations with one of its unsecured creditors, Century Tube, for a sale of its entire business as a going concern.

12. On information and belief, UST was an active participant in the sale negotiations. Acting as lender both to the buyer and to the seller, UST agreed to finance the transaction which provided that the sale price be directly related to the value of the inventory and receivables at the time of the sale.

13. Following negotiations and with the advice and consent of UST, on or about July 14, 1992, the Debtor and Century Tube entered into a letter of intent to sell the Debtor's entire business to Century Tube for a purchase price based principally on a discounted valuation of the inventory and receivables. The purchase price placed no value on the Debtor's goodwill, existing profitable contracts, trade name and going-concern value of the business.

15. The Sale was calculated to enable the business to continue operating just as if the Sale had not occurred, but without having to pay any of the unsecured debt.

16. Pursuant to agreements reached among the parties to and other participants in the Sale, UST financed that portion of the purchase price allocated to the Collateral and released Sullivan [Debtor's chief operating officer, principal stockholder and person responsible for directing all business operations] from the Guaranty [Sullivan's unconditional guaranty of all the Debtor's obligations to UST].

17. On information and belief, the real intent of the defendants-in-counterclaim was that American Chain be a mere continuation of the Debtor.

Based upon these allegations, the Trustee stated the following in Count III:

26. On information and belief, the Sale was made with actual intent to hinder, delay or defraud the unsecured creditors.

27. On information and belief, in exchange for the transfers contained in the Sale, the Debtor received less than a reasonably equivalent value and either was or became insolvent as a result of such transfers.

28. On information and belief, the transfers referred to above occurred primarily for the benefit of Century Tube.

The Trustee fails to cite applicable sections of either the Bankruptcy Code or the Uniform Fraudulent Conveyance Act in his complaint. Assuming the Trustee intends to rely upon sections 548 [3] and 550 [4] of the Bankruptcy Code, it is obvious that the Trustee has done little more than parrot the words of section 548 based upon "information and belief." The Trustee fails to set forth any valuations of the Debtor's assets, although the December 31, 1992 financial statements have been available to the Trustee, as they were part of Raritan's state court action, and the terms of the August 6, 1992 sale have been disclosed by UST in its pleadings, at least with respect to the amount of monies obtained through the sale. Accordingly, the Trustee's amended complaint against ACL can charitably be described as skeletal.

ACL urges the Court to dismiss the Trustee's complaint for failure to comply with Federal Rule of Bankruptcy Procedure 7009, which requires that fraud be pleaded with particularity. The Trustee argues that rule 7009 does not apply to Count III, or in the alternative, that a relaxed standard should apply to constructive fraud complaints.

The Trustee relies upon *In re O.P.M. Leasing Services, Inc.*, 35 B.R. 854 (S.D.N.Y.1983). In that case, the court found that a less stringent standard for pleading fraud was appropriate in a bankruptcy proceeding involving a trustee suing a third party since essential facts would be solely within the knowledge of the defendants and the trustee would have to rely upon second hand information in pleading his or her case. Moreover, the court question the applicability of rule 7009 to complaints alleging constructive fraud. In denying the defendants' motion to dismiss claims under both subsections 548(a)(1) and (2) of the Bankruptcy Code, the court stated:

> This court likewise finds merit in these arguments and thus holds that the Trustee's complaint herein is pleaded with sufficient particularity. This is because in the instant case, the transactions are indeed presumptively fraudulent in that as pleaded, they contain some of the "badges of fraud" … as establishing the requisite intent to defraud. For example, the trustee has pleaded a lack or inadequacy of consideration, the insolvent financial condition of the defendants both before and after the transactions and a discrepancy between the value of the property transferred and the consideration received therefore.

*Id.* at 863.

In view of the need to temper the rigors of rule 7009 and Fed.R.Civ.P. 8 requiring merely a short and concise statement of the claim, *see id.* at 862, this Court

---

**3.** Section 548 of the Bankruptcy Code provides in relevant part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

11 U.S.C. § 548.

**4.** Section 550 provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550.

denies ACL's and Century's motion to dismiss in so far as the Trustee states a cause of action for constructive fraud. However, in view of the passage of time and the availability of more information to the Trustee as a result of the summary judgment motions, the Court shall grant ACL's alternative motion for a more definite statement with respect to the constructive fraud aspect of the Trustee's allegations.

 Given the Debtor's compliance with the bulk sales provisions of Article Six, the Court shall allow ACL's motion to dismiss in so far as the Trustee purports to state a cause of action for intentional fraud. In *United States v. Vertac Chemical Corp.*, 671 F.Supp. 595, 617 (D.Ark. 1987), *vacated in part*, 855 F.2d 856 (8th Cir.1988), the court stated: " '[F]rauds are generally secret, and have to be tracked by footprints, marks, and signs made by the perpetrators, and discovered by the light of the attending facts and circumstances.' " The Trustee has failed to allege any facts that would entitle him to judgment on an intentional fraud cause of action. Alternatively, the bulk sale notice to all creditors, in which the terms and of the sale were described, negates an actual intent to deceive or defraud creditors and would entitle ACL and Century to summary judgment on an intentional fraud count based upon the pleadings and affidavits on file.

## VI. ACL'S AND CENTURY'S MOTIONS TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Through Count V of his Amended Counterclaims, the Trustee seeks the avoidance of an alleged preferential transfer made by the Debtor to ACL and Century. He states: "[o]n information and belief, the transfers to American Chain and Century Tube were, at least in part, transfers on account of the Debtor's antecedent debt to Century Tube which enabled Century Tube to receive more than it would have received in a Chapter 7 liquidation if such transfers had not been made." In Counts IV and II of their so-called Amended Counterclaims, the Trustee and Raritan, respectively, seek judgment in an unspecified amount against ACL and Century on the grounds that ACL and/or Century are "mere continuations of the Debtor" and therefore are liable for all the debts of the Debtor.

### A. The Trustee's Preferential Transfer Claim

 The Court shall grant summary judgment in favor of ACL and Century on Count V because the Trustee cannot sustain his burden of proof on several elements of his preference action with respect to both defendants.[5] The undisputed facts establish that ACL has never been a creditor of the Debtor. Thus, the transfer—the bulk sale—was not for or on account of antecedent debt of ACL, and was not a transfer to or for ACL's benefit as a creditor.

 The Debtor owed Century $600,000 as of the commencement of this case. The debt is still outstanding as the sale did not affect the Debtor's liability to Century. The Trustee's suggestion that the sale somehow benefitted Century for the likelihood that its $600,000 unsecured claim would remain unpaid may be relevant to some other count, but not this preference claim. Thus, the bulk sale was neither to

---

5. Section 547 of the Bankruptcy Code provides:

 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
 (5) that enables such creditor to receive more than such creditor would receive if—
 A) the case were a case under chapter 7 of this title;
 B) the transfer had not been made; and
 C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 11 U.S.C. § 547(b).

Century nor for or on account of the antecedent debt. Accordingly, summary judgment is granted in favor of ACL and Century and against the Trustee on Count V.

B. The Trustee's Successor Liability Claim

The Trustee seeks to hold ACL liable for the debts of the Debtor on the ground that ACL is a mere continuation of the Debtor's business and that Century used ACL as a mere instrumentality or alter ego to acquire the Debtor's business in a fraudulent manner that was prejudicial to the rights of the unsecured creditors.[6] Through Count IV of his third party complaint, the Trustee alleges 1) that substantially all the members of the Debtor's management team have continued their employment with ACL and/or Century; 2) that substantially all Debtor's employees have continued to be employed by ACL and/or Century with the same duties and responsibilities; 3) that ACL and/or Century have continued the Debtor's sole business, using the same plant, equipment, vehicles, and manufacturing processes, operating out of the same offices, selling to the same customers on the same terms and conditions, using the same trade name and good will, purchasing from the same vendors, using the same secured lender, and assuming all debt necessary to operate the business; 4) that Debtor has essentially ceased doing business; and 5) that ACL holds itself out as an ongoing enterprise and continuation of the Debtor.

ACL and Century argue that the Court should dismiss the Trustee's successor liability claim for lack of standing. They principally rely upon two circuit court cases: *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896 (1st Cir.1988), and *In re Ozark Restaurant Equipment Co.*, 816 F.2d 1222 (8th Cir.1987), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). In the First Circuit case, the court stated:

> Causes of action belonging to the debtor are included as property of the estate under 11 U.S.C. § 541(a)(1) (1982). *E.g.*,

> *In re Ozark Restaurant Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir.), *cert. denied*, 484 U.S. 848 [108 S.Ct. 147, 98 L.Ed.2d 102] (1987); 4 Collier on Bankruptcy ¶ 541.10[1], at 541–63. The Trustee, however, has no power to assert any claim on behalf of the creditors when the cause of action belongs solely to them. *E.g., Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 [92 S.Ct. 1678, 1688, 32 L.Ed.2d 195] (1972); *In re Ozark, supra*, 816 F.2d at 1229–30; 4 Collier on Bankruptcy § 541.10[8], at 541–70.

862 F.2d at 900–01.

The Trustee argues that several jurisdictions have expressly upheld the standing of a Trustee to prosecute claims against third parties generally that benefit creditors. He cites cases from the Second, Fifth and Seventh circuits that have held that a Chapter 7 trustee has standing to pierce the corporate veil—a claim which was not at issue in *Rare Coin Galleries, supra*, and which in his view is analogous to successor liability claim. *See St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688 (2d Cir.1989); *In re S.I. Acquisition, Inc.*, 817 F.2d 1142 (5th Cir.1987); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). The Trustee also argues that his prosecution of the successor liability claim is not solely the province of the creditors generally but also a claim of the Debtor. In the Trustee's view, if ACL and Century succeeded to the Debtor's liabilities, the Debtor would have a claim against them for indemnity or contribution.

Assuming without deciding, for the moment, that the Trustee has standing to prosecute his successor liability claims against ACL and Century, the United States Court of Appeals for the First Circuit has recognized several exceptions to the rule that a transferee of assets is not under ordinary circumstances liable for the debts of its predecessor. These narrow exceptions include:

> the alter ego of either ACL or Century.

---

**6.** The Trustee does not allege that the Debtor is

(1) there is an express or implied assumption of liability; (2) the transaction amounts to consolidation or merger; (3) the transaction was fraudulent; (4) some of the elements of a purchaser in good faith were absent; and (5) the transferee corporation was a mere continuation or reincarnation of the old corporation. *Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Association, Inc.,* 437 F.Supp. 1083, 1089–90 (D.Mass.1977), *quoting, Cyr v. B. Offen & Co., Inc.,* 501 F.2d 1145, 1152 (1st Cir.1974). In *Araserv,* the court noted that de facto mergers could be inferred from the following factors: continuity of management, personnel, physical location, assets, general business operations, and shareholders; cessation by the selling corporation of ordinary operations, followed by liquidation and dissolution as soon as possible; and the purchasing corporation paying the purchase price with its own stock. *Id.* at 1090. Similarly, in *Dayton v. Peck, Stow, Wilcox Co.,* 739 F.2d 690 (1st Cir.1984), the court determined that key requirements for finding a merger were continuity of shareholders, continuity of management and the cessation of business operations by the seller followed by liquidation and dissolution as soon as legally and practically possible. *Id.* at 693. More importantly, in view of the Trustee's allegations, the *Dayton* court described the requirements for finding the "mere continuation" exception as follows: " 'The key element of a 'continuation' is a common identity of officers, directors and stockholders in the selling and purchasing corporations.' " *Id., citing, Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 440 (7th Cir.1977).

■ With respect to the exceptions for fraud and lack of good faith, the *Araserv* court correctly determined that they were essentially the same as the exception articulated by the Court of Appeals for the Tenth Circuit in *West Texas Refining & Development Co. v. Commissioner of Internal Revenue,* 68 F.2d 77, 81 (10th Cir. 1933). In that case, the court phrased the exception as follows: "where the transaction is entered into fraudulently in order to escape liability for such debts." *See Dayton,* 739 F.2d at 692. Moreover, in *Day-*

*ton,* the court determined that the burden is on the party challenging the sale to demonstrate successor liability under one of the exceptions. *Id.* at 692.

■ Although the Trustee analyzes the successor liability cases, he fails to address how compliance with the bulk transfer law affects his successor liability claim. Under the Uniform Commercial Code applicable in Massachusetts, the buyer of assets at bulk sale is not liable for the debts of the seller as long as there has been compliance with the bulk sales procedure set forth in the statute. If there has been compliance with the statute, the transfer is effective against creditors of the seller. Mass.Gen.Laws Ann. Ch. 106, §§ 6–101–6–110. A trustee in bankruptcy has the power under 11 U.S.C. § 544 to avoid an improper bulk sale; however, a sale consummated in accordance with the statute is not subject to avoidance. *See In re Verco Industries,* 10 B.R. 347 (Bankr. 9th Cir.1981), *rev'd, in part on other grounds,* 704 F.2d 1134 (9th Cir.1983).

■ The issue that this Court must resolve is whether compliance with the Uniform Commercial Code's bulk transfer provisions protects ACL and Century from liability to the Trustee under Count V. The Trustee does not allege that the Debtor failed to comply with the bulk transfer provisions of Article Six. The Court's review of the affidavits confirms that there was compliance with Article Six so that the sale, notice of which specifically stated that the sale proceeds would be insufficient to pay unsecured creditors of the Debtor in full, is effective against the Debtor's creditors. This conclusion is supported by the Superior Court's refusal to enjoin the sale in its entirety. It would be anomalous indeed if the Trustee could accomplish through his successor liability count what he could not accomplished due to the parties' compliance with the bulk transfer statute. This paradox has not gone unnoticed by commentators:

Assume C is a similarly situated creditor who, by virtue of one or more of the foregoing occurrences has been left

wholly unpaid following a bulk transfer.... What might be done on his behalf to make for a more equitable distribution all around? First he may be able to throw the transferor into involuntary bankruptcy, hoping thereby (1) to have a trustee receive all the assets transferred to creditors and to the bulk transferee, and (2) to have this trustee distribute the proceeds of retrieved assets equitably on a pro rated basis to the transferor's creditors.

\* \* \* \* \* \*

... [E]ven if the transferor's assets are still around, his trustee in bankruptcy still might not be able to reach them under applicable law. These assets might not be subject to retrieval under the trustee's various avoiding powers. It ... [might] ... not be possible for the trustee to avoid the transfer as a bankruptcy preference ... [or] ... as a fraudulent conveyance.... Then, too, the bulk transfer can hardly be a voidable lien or the like under the law. Could the trustee attack the transfer as successor to the rights of actual creditors or in its own right as a hypothetical lien creditor on the date of bankruptcy? If the bulk transfer complied with the requirements of Article Six, then the theory is that an ordinary judgment or attaching creditor of the transferor could not reach the assets in the transferee's hands. Thus, the trustee could not invoke rights as a successor to actual creditors. Similarly the trustee could not effectively function as a hypothetical lien creditor on assets of the transferor bankrupt as of the date of bankruptcy, and on that date the transferor had already transferred the assets to the complying bulk transferee.

2 J. White & R. Summers, *Uniform Commercial Code*, § 20–8, at 130–31 (3d ed. 1988). This Court agrees with this analysis, and, therefore, holds that the Trustee lacks standing to bring Court V. Moreover, assuming that he did have standing due to failure to comply with Article Six, the Trustee has failed to demonstrate any issues of material fact that would prevent the entry of summary judgment in ACL's and Century's favor. There simply are no genuine issues of fact concerning the continuation of the Debtor's business by ACL. Under the Asset Purchase Agreement, ACL expressly did not assume the Debtor's liabilities. Additionally, Robert P. Pfautz, an Executive Vice President of Century and the President of ACL, stated the following in two separate affidavits that have gone unrebutted:

ACL is operated under new policies and practices designed to change the business from that previously operated by the Debtor, which had been incurring very substantial losses, into a viable business able to function as a reliable distributor for Century Tube and other suppliers. In order to accomplish this, ACL has done the following:

a. obtained new and less expensive sources of financing, based on Century Tube's equity investment of $500,000 and a Century Tube guaranty of the new debt;

b. obtained over $600,000 in new inventory on credit from Century Tube, so as to have adequate supplies of product to sell to customers;

c. established new policies, which salesman are required to adhere to, with respect to extension of credit to customers;

d. established new policies, which salesmen are required to adhere to, relating to pricing to customers;

e. improved manufacturing methods and purchased new manufacturing equipment;

f. eliminated the positions of the credit manager and two branch managers and reduced compensation to all white collar employees who remain in ACL's employ;

g. established controls on all purchases by ACL personnel; and

h. established a budgeting process, including forecasts and goals.

No member of the Debtor's management nor any former employee of the Debtor is employed by Century Tube.

No member of the Debtor's management employed by ACL has the same duties,

powers or responsibilities he had with the Debtor. For example, none of them has any authority to incur substantial expenditures nor any authority to sign checks.

ACL does not employ all former employees of the Debtor; ACL does not sell on the same terms and conditions as the Debtor; ACL does not purchase from the identical vendors on the same terms as the Debtor; ACL does not use all of the same secured lenders on the same terms as the Debtor; and ACL did not purchase the real estate owned by the Debtor....

ACL was established as a separate corporation with substantial equity. Its assets and liabilities are not commingled in any way with those of Century Tube.

No present or former stockholder of the Debtor has any ownership interest, direct or indirect, in ACL. Century, the sole stockholder of ACL, has invested approximately $500,000 of equity in ACL.

Mr. George Sullivan is the only officer or director of ACL who was associated with the Debtor. Mr. Sullivan is an executive vice president and one of five directors of ACL. Mr. Sullivan does not control ACL or determine its policies. He has no authority to determine pricing of products, to approve credit to customers, to sign checks, or to make major purchases. Each of the other four directors of ACL, its Chairman, President, Senior Executive Vice President and Treasurer, are individuals associated with Century and/or with its parent company, who have no relationship with the Debtor.

In view of these affidavits, the Court is compelled to grant summary judgment to ACL and Century with respect to the mere continuation exception to the rule that a transferee of assets is not liable to the creditors of the transferor.

█ Moreover, there was no evidence presented of fraudulent conduct with respect to the sale. To repeat, the Trustee does not contend that the bulk sales requirements were violated. The terms of the sale were fully described in the letter of July 24, 1992. Although the Trustee may be able to sustain his burden of proof

with respect to Court III and avoid the transfer under 11 U.S.C. § 548(a)(2) of the Bankruptcy Code, the Trustee has cited no cases and the Court has been unable to find any cases that hold that constructive fraud alone is sufficient to impose successor liability on a transferee where there has been compliance with the provisions of Article Six.

█ Finally, the Trustee has filed a request pursuant to Rule 56(f) that the Court deny or continue the motion for summary judgment on the ground that he has not had sufficient opportunity to conduct discovery. The Court does not agree. The Complaint commencing this adversary proceeding was filed on September 9, 1992 and the Trustee's "Amended Counterclaims" were filed on December 7, 1992. The hearing on ACL's Motion for Summary Judgment was held on March 4, 1993. Accordingly, the Trustee has had sufficient time and ample opportunity to conduct discovery to develop facts in opposition to summary judgment.

C. Raritan's Successor Liability Claim against ACL and Century

█ In view of the Court's alternative rulings with respect to the Trustee's standing and lack of evidence to avoid summary judgment on Count IV, and in consideration of the fact that Raritan's claim against ACL and Century is at most "related to" this proceeding, this Court abstains from considering Count II of Raritan's so-called Amended Counterclaims against ACL and Century. *See* 28 U.S.C. § 1334.

VII. CONCLUSION

In accordance with the foregoing, the Court hereby grants summary judgment in favor of UST and against Raritan and Cyclone on UST's motions for summary judgment and in favor of UST and against Raritan on Raritan's counterclaim against UST. The Court denies UST's request for turnover of the funds in escrow until such time as the Trustee's equitable subordination count is determined.

**380**

The Court dismisses the Trustee's fraudulent conveyance count against ACL and Century to the extent it purports to state a cause of action for intentional fraud and orders the Trustee to amend that count to the extent it states a cause of action for constructive fraud. The Court grants summary judgment to ACL and Century and against the Trustee on the Trustee's preference and successor liability counts against them. The Court abstains from considering Raritan's successor liability count against ACL and Century and therefore makes no rulings with respect to ACL's and Century's motion to dismiss Raritan's claims against them.

The foregoing shall constitute findings of fact and rulings of law in accordance with Federal Rule of Bankruptcy Procedure 7052.