**In re 9281 SHORE ROAD OWNERS CORP., Debtor.**

**9281 SHORE ROAD OWNERS CORP., Appellant,**

**v.**

**SEMINOLE REALTY CO., a New York General Partnership, Appellee.**

No. 93–CV–4342 (ADS).

United States District Court, E.D. New York.

Oct. 16, 1995.

Kensington & Ressler P.C. (Michael J. Venditto, of counsel), New York City, for appellant.

Jaspan, Ginsberg, Schlesinger, Silverman & Hoffman (Kenneth P. Silverman, Salvatore LaMonica, of counsel), Garden City, NY, for appellee.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This is an appeal by the Debtor–Appellant 9281 Shore Road Owners Corporation (the "Debtor") from a decision and order of United States Bankruptcy Judge Edward J. Ryan, which dismissed the Debtors Chapter 11 petition on the ground of lack of good faith.

### BACKGROUND

The Debtor is a residential New York cooperative apartment corporation. The Debtor was organized by Seminole on or about February 4, 1985. At its inception, all of the outstanding shares of common stock of the Debtor were issued to Seminole. The Debtor's sole asset is an apartment building located at 9281 Shore Road in the Bay Ridge section of Brooklyn ("the Building"). Seminole Realty Co. ("Seminole") was the sponsor of the offering plan which converted the building to cooperative ownership. The building contains 107 apartments, of which 58 are owned by persons who purchased their shares in the Debtor corporation and their apartments from Seminole, the sponsor, subsequent to conversion to cooperative ownership in 1988. The remaining 49 apartments are owned by Seminole.

On April 9, 1985, Seminole caused the Debtor to acquire the building from an unrelated entity for a total purchase price of $4.2 million. The purchase price for the building was financed in the following manner: (1) The Debtor assumed a first mortgage on the property held by American Savings Bank in the approximate principal amount of $1,049,-195.50 ("the First Mortgage"); (2) The Debtor borrowed the sum of $2 million from Barclay's Bank of New York ("Barclays") giving Barclays a second mortgage on the property in that amount (the "Second Mortgage"); and (3) the Debtor contributed the sum of $939,764.82, representing funds loaned or contributed by Seminole. So that, after acquisition of the building on April 9, 1995, the Debtor had title to the building, subject to two mortgages in the sum of approximately $3 million.

On or about December 5, 1986, Seminole filed a cooperative offering plan (the "Plan") to convert the property to cooperative ownership. The plan enabled Seminole to offer apartments in the building for sale as part of Seminole's effort to convert the property to cooperative ownership. The offering plan disclosed all of the essential aspects of the financial transaction resulting in the conversion, including the details of a Wrap Mortgage, which will be later discussed. The offering plan was apparently provided to each prospective purchaser.

On or about June 8, 1988, the conversion to cooperative ownership closed. On that date, Seminole caused the Debtor to convey to Seminole a mortgage note in the sum of $3,500,000, and a Wrap Mortgage, encom-

passing both the existing first and second mortgages (The "Wrap Mortgage"). The Wrap Mortgage created an additional indebtedness secured by the building in the amount of $615,629.47 above the amounts owing under the existing two mortgages. Raising a major issue in this case, the Debtor contends that there was no consideration for this additional indebtedness.

Prior to January 1, 1993, the Debtor was current on all of its obligations under the mortgage. However, the January 1993 mortgage payment was placed into a special account and not paid to Seminole. This default occurred approximately six months prior to the due date of the balloon payment under the terms of the Wrap Mortgage. Immediately after the Debtor's default on the January payment, on or about January 10, 1993, Seminole instituted a foreclosure action in the Supreme Court, State of New York, County of Kings (the "State Court"), entitled *Seminole Realty Co., a New York General Partnership, Plaintiff, v. 9281 Shore Road Owners Corp., et al., Defendants.* Shortly after the institution of the foreclosure action, on January 22, 1993, Seminole obtained an *ex parte* order from the State Court appointing Morton Freedman as receiver of the property with authority to collect all rents and profits and to take possession, custody and control of the property. Pursuant to an order to show cause of the State Court dated February 9, 1993, the Debtor's management company was enjoined and restrained from transferring any funds out of the Debtor's operating accounts to any party, other than the receiver.

On February 11, 1993, the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code. On that date, the Debtor also filed a notice of removal to remove the foreclosure action from the State Court to the Bankruptcy Court. By stipulation and order dated February 24, 1993, the Debtor consented to a remand of the foreclosure action to the State Court. By orders of February 24, 1993 and March 12, 1993, the Bankruptcy Court modified the automatic stay to allow the foreclosure action to proceed uninhibited by the bankruptcy filing and continued the State Court receiver in custody and control of the property.

The petition, schedules and statement of financial affairs filed by the Debtor with the Bankruptcy Court state that, as of the filing date, the Debtor had the following unsecured creditors: Schedule E, unsecured priority creditors, $60.00; Schedule F, unsecured non-priority creditors, $8,949.51. It was stipulated at the hearing by Debtor's counsel that all priority and non-priority unsecured debts on the Debtor's schedules were incurred in the ordinary course of the Debtor's business and were not due and payable more than sixty (60) days prior to the filing date. In addition, the Debtor had on deposit more than $31,000. It was further stipulated that as of the filing date, the Debtor had sufficient funds in its bank accounts to pay its reasonably anticipated expenses, including without limitation, the sums due Seminole on account of the monthly payments on the Wrap Mortgage. The Bankruptcy Court made the further finding that the Debtor's unsecured creditors are minimal in nature particularly in relation to the claims of Seminole who is the Debtor's largest and only legitimate creditor.

On or about August 27, 1992, the East New York Savings Bank ("East New York") issued a document described by Seminole and the Bankruptcy Court as a "loan commitment letter" to the Debtor indicating its willingness to provide the Debtor with refinancing in an amount up to three million six hundred thousand and 00/100 ($3,600,000.00) dollars. The commitment letter was conditioned upon certain actions, which Seminole agreed to undertake. Dr. Anne Venezia, the President of the Debtor's board of directors testified at the hearing that the board chose not to pursue the East of New York refinancing "because the raise in the maintenance would have left the co-op with numerous defaults by its shareholder". (Tr. at 69).

### THE DEBTOR'S CONTENTIONS IN THE BANKRUPTCY COURT

The Debtor contended that all of the mortgages on the building matured in June 1993 and it could not obtain refinancing. On February 11, 1993, a Chapter 11 petition in bank-

ruptcy was filed by the Debtor. Thereafter, on or about March 3, 1993, an adversary proceeding was commenced against Seminole and five individual defendants. The complaint in the adversary proceeding set forth eight claims for relief. The thrust of the claims charge that Seminole, aided and abetted by the three attorneys who nominally functioned as the directors of the Debtor, extracted the equity from the Debtor without conferring on it any corresponding benefit or consideration. As a result, the Complaint alleged, the Debtor was rendered insolvent, without sufficient capital to carry on its business, and was unable to refinance its secured mortgages. Seven of the claims in the Complaint were directed against Seminole, and the eighth was directed solely against the three attorneys.

Six of the seven claims asserted against Seminole are common law fraudulent conveyance claims which the Debtor states it was empowered to bring in a bankruptcy proceeding under the provisions of Section 544(b) of the Bankruptcy Code, (11 U.S.C. Section 544(b)). The remaining claim against Seminole is an equitable subordination claim asserted pursuant to Section 510(c) of the Bankruptcy Code, (11 U.S.C. Section 510(c)). According to the Debtor, none of these seven claims could be heard in a state court action.

The Debtor contended that this Chapter 11 case was filed in good faith to protect its assets namely the building and its individual shareholders, while seeking the special relief available to a debtor-in-possession under the Bankruptcy Code to avoid inequitable transactions tainted by self dealing which stripped the Debtor of its assets and saddled it with an enormous debt.

## SEMINOLE'S CONTENTIONS IN THE BANKRUPTCY COURT

According to Seminole, the Debtor was organized by Seminole on or about February 4, 1985 for the purpose of obtaining title to the Building as part of Seminole's real estate investment plan of converting the property to cooperative ownership. At its inception all of the outstanding shares of common stock of the Debtor were issued to Seminole, in exchange for its capital contribution of $939,-764.82. The offering plan is expressly premised upon the sale by Seminole, as sponsor, of its entire shares in the Debtor.

According to Seminole, the purchase price of the Building of approximately $4,000,000 was financed in the following manner: (i) the Debtor assumed the first mortgage on the property, held by the American Savings Bank, in the approximate principal amount of $1,049,195.50 (the "First Mortgage"); (ii) the Debtor borrowed $2,000,000 from Barclays Bank of New York who was given a second mortgage on the property in that amount (the "Second Mortgage"); and (iii) the Debtor paid $939,764.82, representing the funds contributed to the Debtor by Seminole.

On or about December 5, 1986, the Offering Plan to convert the property to cooperative ownership was accepted for filing by the New York State Department of Law. This enabled Seminole, as the sponsor, to offer apartments in the property for sale as part of Seminole's effort to convert the property to cooperative ownership. The conversion of the Debtor to cooperative ownership was consummated on or about June 8, 1988. The offering plan, provided to each prospective purchaser, disclosed all of the essential aspects of the financial transaction resulting in the conversion, including the details of the Wrap Mortgage.

Since the shares of the Debtor were wholly owned by Seminole, it contended that there was consideration for the issuance of the Wrap Mortgage to Seminole. In sum, Seminole contended that it received the Wrap Mortgage in exchange for the sale of its stock of the Debtor corporation to each apartment purchaser. Each prospective purchaser had the opportunity to evaluate whether to purchase the apartment with full knowledge of the Wrap Mortgage in favor of Seminole.

Further, Seminole contended that the relationship between the principals of Seminole and the members of the law firm retained by Seminole to prepare the offering plan were fully disclosed in the plan. The offering plan provided in its introduction that "Seminole, and its principals, own all of the issued and outstanding capital stock of the Apartment

Corporation ...". Offering plan at p. 2. Further, the offering plan provided that all of the proceeds realized from the sale of the shares would be retained by the sponsor, except for the sums to be contributed to the Debtor's "Capital Reserve Fund" and "Working Capital Fund". Offering plan at p. 2. Seminole emphasized that the purchasers agreed to purchase their stock from the sponsor, namely, Seminole, not from the Debtor. Accordingly, Seminole claims that it was the sole shareholder of the Debtor's shares.

After the conversion to cooperative ownership on or about June 8, 1988, the Debtor through its Board of Directors and its managing agent, managed the day to day operations of the property. The Debtor timely made all monthly installment payments on the Wrap Mortgage. In turn Seminole made all its monthly payments as a result of its ownership of the unsold shares of the Debtor. These payments by Seminole include the monthly payments to the Bank of New York, the holder of the first mortgage as provided for under the terms of the Wrap Mortgage. In fact, Seminole has continued to make monthly payments to the Bank of New York, which has not commenced its own foreclosure action.

Promptly after the Debtor's default on the January 1993 Wrap Mortgage payment, Seminole instituted a foreclosure action in the Supreme Court, Kings County. As stated above, Seminole obtained an ex parte order from the Supreme Court appointing Morton Freedman as receiver of the property.

According to Seminole, in an attempt to assist the Debtor in obtaining refinancing and to protect its own equity interest in the Debtor, Seminole sought and obtained a loan application letter from the East New York Savings Bank. According to Seminole, East New York was willing to provide the Debtor refinancing up to $3.6 million dollars upon economically feasible terms. In addition, Seminole offered 1) to advance the $35,000 application fee, 2) to pledge its unsold shares and 3) to agree to deposit the sum of $200,-000 at East New York. Seminole states that the Debtor refused to pursue the East New York offer and instead, elected to default under the terms of the Wrap Mortgage.

According to Seminole, instead of pursuing the East New York refinancing, the Debtor chose to file for Chapter 11 relief and litigate certain issues involving the invalidity of the Wrap Mortgage. In fact, Seminole points out that Judge Ryan indicated his belief that the bankruptcy petition "was merely a litigating tactic to use the Bankruptcy Court for the forum to adjudicate the merits ... of the security interest under attack." (Tr. at 85, 86). Further, the Debtor conceded that its sole purpose in filing the petition was to litigate with Seminole rather than accept refinancing. (Tr. at 61). It did so by instituting an adversary proceeding in the Bankruptcy Court.

In addition, Seminole asserts that as of February 1, 1993, the date of filing, the Chapter 11 petition and schedules, the Debtor stated that as of the filing date, the Debtor's unsecured creditors, including priority and non-priority claims, totalled only $9,409.51. Moreover, it was stipulated at the hearing that the unsecured creditor represented claims that were incurred in the ordinary cause of the Debtor's business and were due and payable by 60 days prior to the filing date. Also, the Debtor stipulated it had sufficient funds on deposit to pay its reasonably anticipated operating expenses, including the monthly payments due Seminole under the Wrap Mortgage, as well as the unsecured and priority creditors listed in its petition.

## THE ADVERSARY PROCEEDING

In the complaint in the adversary proceeding the defendants named are Seminole Realty Co., Sanford Sirulnick, Joseph Sirulnick, David T. Goldstick, Franklin J. Barr and Larry H. Abrams. The Sirulnicks were general partners of Seminole. In addition, at various times the defendant Sanford Sirulnick served as an officer and director of the plaintiff-debtor. The defendants David T. Goldstick, Franklin J. Barr and Larry H. Abrams are attorneys who were officers and directors of the plaintiff-debtor.

The adversary proceeding alleges, among other things, a cause of action attacking the validity of the Wrap Mortgage as a fraudulent conveyance under Section 544(b) of the Bankruptcy Code; a cause of action under Section 510(c) of the Bankruptcy Code seeking to equitably subordinate Seminole's claims; and a cause of action for breach of fiduciary duty by Seminole and its attorneys, as a result, among other things, of a conflict of interest by the attorneys in their dual capacity.

The thrust of the complaint is that the defendants did "extract all of the plaintiff's equity, without granting to or conferring on, the plaintiff any corresponding benefit or consideration" (Par. 10 of Complaint). In particular, the complaint alleges:

10. This case arises from the efforts by the Seminole defendants, aided and abetted by the Goldstick defendants, to extract all of the plaintiff's equity without granting to or conferring on, the plaintiff any corresponding benefit for consideration.

11. Seminole caused that plaintiff to issue stock with an estimated, aggregate value of $14 million, for which plaintiff did not receive fair consideration.

12. As a result of the defendant's wrongful conduct, the plaintiff has been rendered insolvent, without sufficient capital to carry on its business, and cannot refinance its mortgages. Further, Seminole is now seeking to foreclose the very mortgage that it unjustly caused the plaintiff to grant to it, with the consent of the Goldstick defendants, who simultaneously served as the plaintiff's officers and directors as well as the attorneys for the plaintiff and Seminole. If the foreclosure goes forward, the residents who live at the property may lose their apartments.

17. The acquisition of the property was part of an overall scheme by the Seminole defendants to convert the plaintiff to cooperative ownership, sell the plaintiff's shares to third party purchasers, and reap an enormous profit with a relatively small investment. As part of the scheme, Seminole also intended to extract the remaining equity from the property by causing the plaintiff to grant Seminole an inflated $3.5 million wrap-around mortgage (the "Seminole Wrap Mortgage") which encumbered the property beyond its ability to refinance the First and Second Mortgages which aggregated the lesser, approximate sum of $2.89 million.

18. In furtherance of its scheme, and on or about December 8, 1986, Seminole, as sponsor, filed a Cooperative Offering Plan (the "Plan") pursuant to which it sought to convert the plaintiff to cooperative ownership. According to the Plan, Seminole estimated its profit from the transaction to be $10,385,022.68, consisting of the Seminole Wrap Mortgage and all of the plaintiff's shares.

D. The Closing

19. The plaintiff's conversion to cooperative ownership closed on or about June 8, 1988. On that date, Seminole caused the plaintiff to deliver to it title to the unsold shares and the cash proceeds of any sold shares (the "Equity") which, according to the Plan, were worth the aggregate value of as much as $13,987,663.

20. In addition, and on or about the closing date, Seminole caused the plaintiff to deliver to it a mortgage note (the "Seminole Mortgage Note"), in the sum of $3,500,000 to Seminole, and the Seminole Wrap Mortgage to secure that note.

24. At the time of the closing, the officers and directors of the plaintiff were the defendants David T. Goldstick, Franklin J. Barr and Larry H. Abrams. Upon information and belief, they were also partners or associates in the law firm that represented Seminole in connection with the delivery by the plaintiff to Seminole of the Seminole Mortgage Note and the Seminole Wrap Mortgage.

The complaint in the adversary proceeding sets forth eight claims. The first four claims are based on alleged violations of the New York Debtor and Creditor Law Sections 273, 274, 275 and 276, each coupled with the related Bankruptcy Code Section 544(b). The fifth claim is based on conveyances to Seminole unsupported by consideration. The sixth claim asks for a judgment against Seminole cancelling the Seminole Mortgage Note, the Seminole Wrap Mortgage and the Unsold

Shares, voiding all liens and requesting an accounting for profits received and income earned in connection all these matters. The seventh claim seeks a subordination of the Seminole claims to all other claims or interests and a transfer of the Seminole liens to the bankrupt estate, pursuant to Bankruptcy Code Section 510(c). The eighth claim is based on a breach of fiduciary duty by the attorneys Goldstick, Barr and Abrams.

### THE MOTIONS AT ISSUE

Seminole moved to dismiss the Chapter 11 proceeding. Alternatively, it asked the Bankruptcy Court 1) afford it relief from the automatic stay so Seminole could proceed to foreclose its mortgage in State Court and 2) vest the State Court receiver with broad powers over the debtor-in-possession.

Seminole's motion was heard by the Bankruptcy Court in an evidentiary hearing on March 12, 1993. A decision was rendered by the Bankruptcy Judge on July 28, 1993 granting portions of Seminole's motion by 1) continuing the State Court appointed receiver and 2) concluding that "the Debtor's Chapter 11 petition lacks good faith and should be and is dismissed."

### THE CONTENTIONS ON APPEAL

The present contentions of the Debtor are: 1) the motion to dismiss the Chapter 11 proceeding was not properly before the Bankruptcy Court, since the required notice to creditors and equity security holders was not given; 2) Seminole did not sustain its burden of proving that it was entitled to dismissal of the Chapter 11 proceeding because it was not filed in good faith; 3) retention of the Debtor's property by Seminole's receiver does not serve the interests of the creditors; and 4) Seminole was not entitled to relief from the automatic stay pursuant to the provisions of Bankruptcy Court Section 362(d)(1).

On the other hand, Seminole contends that: 1) the service of its motion was in compliance with the order of the Bankruptcy Court and, therefore, the motion was properly before the Court; 2) the bankruptcy proceeding was nothing more than a litigation tactic in a two-party civil dispute, which

should properly be heard in the State Court; and 3) the evidence clearly demonstrated the Debtor's intention to litigate frivolous and meritless claims "to economically coerce Seminole into renegotiating the terms of the wrap mortgage; so that the Article 11 proceeding was filed in 'bad faith'."

While the Debtor contends that the adversary proceeding contains causes of action which can only be maintained in the Bankruptcy Court, Seminole asserts that the adversary proceeding is clearly frivolous, without basis in law and possibly sanctionable. According to Seminole, the adversary proceeding consists of causes of action recognized by state law, which could, and should be, properly brought in the State Court in the context of the pending foreclosure action. In sum, Seminole contends that the adversary proceeding is simply a transparent attempt by the Debtor to legitimize this bankruptcy proceeding and another litigation tactic to economically coerce Seminole into renegotiating the terms of the Wrap Mortgage.

### DISCUSSION

#### A. The Standard of Review

Findings of fact made by a Bankruptcy Court are reviewed by the District Court on appeal under a clearly erroneous standard, (See 11 U.S.C. Bankruptcy Rule 8013), while conclusions of law are reviewed *de novo*. *In re Momentum Manufacturing Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994); *In re PCH Associates*, 949 F.2d 585, 597 (2d Cir. 1991).

Bankruptcy Rule 8013 sets forth the standard of review as to findings of fact, as follows:

Rule 8013. Disposition of Appeal; Weight Accorded Bankruptcy Judge's Findings of Fact

On an appeal the district court or bankruptcy appellate panel may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy

court to judge the credibility of the witnesses.

■ A reasonable interpretation of evidence different than that reached by the bankruptcy court is clearly not enough to overturn the Bankruptcy Court's ruling; the court's finding of facts must be clearly erroneous. *Szewczyk v. Wojtaszek*, 164 B.R. 604 (N.D.Ill.1994). A Bankruptcy Court's findings of facts are "clearly erroneous" if the appellate court has a definite and firm conclusion that a mistake has been committed, after reviewing the entire record. *In re Briscoe Enterprises, Ltd., II*, 138 B.R. 795 (N.D.Tex.1992).

### B. *Seminole's Motion to Dismiss was Properly Before the Bankruptcy Court*

■ Seminole brought on its motion to dismiss the Chapter 11 petition by an order to show cause, which directed Seminole to give notice only to the Debtor and the Office of the U.S. Trustee. Bankruptcy Rule 2002(a)(5) provides that, with some exceptions, all creditors shall receive 20 days notice of any hearing with regard to a motion to dismiss the Chapter 11 petition. Also, Bankruptcy Rule 2002(d)(4) requires that such notice be given to all equity security holders. The Debtor contends that since no such notice was given, certain parties-in-interest were deprived of an opportunity to be heard and the motion should have been denied on that ground.

In opposition, Seminole contends that the Debtor's counsel was present on February 18, 1993, when the Bankruptcy Court signed the order to show cause. Not only did the Debtor fail to object on this ground at the February 18, 1993 hearing, but it failed to raise this issue at the two subsequent hearings at the time the merits of the motion were argued. In addition, the Debtor failed to raise this issue in its pleadings. In fact, the issue of the adequacy of the notice was raised for the first time in the Debtor's post-trial memorandum. In addition, Seminole contends that since this matter is an adversary proceeding, the rules contained in Part VII of the Bankruptcy Rules apply. Under these rules, says Seminole, the failure to raise this "process issue" in its initial pleading results in a waiver. The Court agrees.

Bankruptcy Rule 7012(b) incorporating Fed.R.Civ.Proc. 12(b) to (h) provides as follows:

A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g) or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

Since the Debtor should have raised the issue of lack of notice to other parties at the time of its initial responsive pleading, it waived this defense, as a matter of law. Also, as a corollary to this rule, the Debtor "should have revealed that concern when he appeared but before he actively participated" at the hearings. *Matter of Muller*, 851 F.2d 916, 919 (7th Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989).

Furthermore, this Court notes that the Debtor's counsel, by letter dated February 19, 1993 and notice dated February 19, 1993, acknowledged that all of the tenants of the building had been provided with copies of the order to show cause. Also, at the hearing the Debtor's counsel acknowledged that certain shareholders were in attendance.

Accordingly, the Court finds that Seminole's motion to dismiss was properly before the Bankruptcy Court.

### C. *As to the Dismissal of the Debtor's Chapter 11 Petition*

#### 1. *The Standards of Dismissal*

Bankruptcy Code Section 1112(b) (11 U.S.C. Section 1112[63] ) provides the statutory authority for a dismissal of the Debtor's Chapter 11 petition, as follows:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case

under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

■ A Chapter 11 proceeding may be dismissed for cause pursuant to Section 1112 of the Bankruptcy Code if the petition was not filed in good faith. *In re Phoenix Piccadilly,* 849 F.2d 1393, 1394 (11th Cir.1988); *Albany Partners, Ltd. v. Westbrook,* 749 F.2d 670, 674 (11th Cir.1984); see also *Shell Oil Co. v. Waldron,* 785 F.2d 936 (11th Cir.) cert. dism. 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986).

■ While there is no particular test for determining whether a Debtor filed a petition in bad faith, the courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of reorganization. In particular, the courts may consider factors which demonstrate that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights. *In re Albany Partners, Ltd.,* 749 F.2d at 674.

These factors include the following:

(i) The debtor has only one asset, the property, in which it does not hold legal title;

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) The debtor has few employees;

(iv) The property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in the pending State Court action; and

(vi) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

In a similar case in this field, *Little Creek Development Company v. Commonwealth Mortgage Corp.,* 779 F.2d 1068 (5th Cir.1986),

the starting place for review of a "good cause" determination, is described as follows:

Bankruptcy is an equitable remedy whereby a debtor is clothed with the protection of an automatic stay, preventing his creditors from acting against him for a period of time, in order to facilitate rehabilitation or reorganization of his finances and to promote a "fresh start" through the orderly disposition of assets to satisfy his creditors. Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.

■ In the so-called "single-asset" real estate situation with a pending state court foreclosure action, two of the important factors to consider weigh heavily in this case. They are 1) the hope of rehabilitation, and 2) can the dispute be resolved in the pending State Court action?

Further, as set forth in another important case in this field, *Carolin Corporation v. Miller,* 886 F.2d 693, 694 (4th Cir.1989), it was held:

This appeal requires us first to decide whether and, if so, by what standard, a bankruptcy court may dismiss a voluntary Chapter 11 bankruptcy petition at the very outset because it was not filed "in good faith." It then requires us to decide whether the petition here in issue was properly dismissed for that reason.

On the first issue we hold that a bankruptcy court may dismiss such a petition for want of good faith in its filing, but only with great caution and upon supportable findings both of the objective futility of any possible reorganization and the subjective bad faith of the petition in invoking this form of bankruptcy protection.

## 2. The Decision of the Bankruptcy Court

■ After considering the evidence and the arguments, the Bankruptcy Judge rendered a decision on July 28, 1993. Initially, the court notes that the Bankruptcy Judge did not issue a written opinion. He adopted most of the proposed finding of facts

and conclusions of law submitted by Seminole, although this procedure is frowned upon (*U.S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–657, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 [1964] ), and requires the reviewing Court to "engage in a more careful analysis of adopted findings" than those authored by the trial judge. *Hagans v. Andrus*, 651 F.2d 622, 626 (9th Cir.) cert. den. 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); see also *Andre v. Bendix Corp.*, 774 F.2d 786, 799–801 (7th Cir.1985).

In this Circuit, it has been noted that adopting a party's version sometimes makes it difficult to ascertain the trial court's reasoning. *Dole Fresh Fruit v. United Banana Co., Inc.*, 821 F.2d 106, 110 (2nd Cir.1987). The Bankruptcy Judge stated that he was fully aware of the above rule, and explained his adoption of Seminole's findings of fact and conclusions of law as follows:

However, when the findings proposed are supported by the evidence presented and when the conclusions proposed are agreeable with the law, no useful purpose would be served by rewriting the same. Fed. R.Civ.P. 52; B.R. 7052; *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 [105 S.Ct. 1504, 84 L.Ed.2d 518] (1985).

Accordingly, the findings of fact and conclusions of law as proposed by Seminole Realty Co., are adopted in substance by this Court.

 A review of the findings of fact reveals that the Bankruptcy Court made clearly erroneous findings with regard to the refinancing by the East New York Savings Bank. In that regard the Court stated:

"On or about August 27, 1992, the East New York Savings Bank ("East New York") issued a loan commitment letter to the debtor indicating its willingness to provide the debtor with refinancing in an amount up to three million six hundred thousand and 00/100 ($3,600,000.00) dollars." (Finding 29).

and that

"The East New York refinancing would have resulted in a seven (7%) percent increase in the monthly maintenance payments of the debtor's shareholders and would have provided the debtor with sufficient funds to satisfy the balloon payment pursuant to the terms of the wrap mortgage." (Finding 34).

In making these findings, the Bankruptcy Judge failed to note the substantially unrefuted testimony of Dr. Anne Venezia, President of the Debtor, who testified that the Debtor began the process of looking for refinancing in April, 1991, more than two years before the due date of the Wrap Mortgage. Dr. Venezia also testified that East New York was among the banks contacted by the Debtor and that East New York turned down the Debtor's request for a $3.5 million refinancing, indicating that it could not make a loan in excess of $2 million to $2.4 million. Tr. at 53, 54. Subsequently, Seminole's principal, Sanford Sirulnick, stated that "he had a connection" at East New York's parent and could obtain refinancing by "calling in a favor." Tr. at 55.

As stated above, the Bankruptcy Judge made a finding that East New York issued a loan commitment letter to the Debtor indicating its willingness to refinance up to $3,600,000, upon certain conditions, which conditions were met by Seminole. In fact, the record reveals that there was no firm commitment made by East New York. The first words of the so-called commitment letter, dated August 27, 1992, read as follows:

We are pleased to inform you that the East New York Savings Bank (the "Bank") *is willing to consider your request,* on behalf of your client(s), for a first mortgage loan on the above-captioned property on the following terms: (emphasis supplied).

The letter concludes in the same contingent language, set forth in dark letters, as follows:

**It is hereby acknowledged and understood that this letter is not a letter of commitment, nor is it intended to be a letter of commitment, and the bank is not bound to any of the terms and conditions herein outlined. The interest rate and all other provisions are not set until the loan is approved and a written commitment is issued to the borrower.**

Thus, the finding that East New York agreed to a replacement mortgage, and that this mortgage "would have provided the Debtor with sufficient funds to satisfy the balloon payment pursuant to terms of the wrap mortgages" (Finding 34), is clearly erroneous.

More importantly, a de novo review of the conclusions of law of the Bankruptcy Judge reveals serious errors. A thrust of the decision on appeal and a recurring theme in the findings and conclusions of the Bankruptcy Judge, is that each of the causes of action in the adversary proceeding are essentially state law claims which can be raised in the pending state court foreclosure action. A sample of these findings and conclusions are as follows:

### Findings of Fact

41. The debtor's purpose in filing the instant Chapter 11 petition was to litigate the issues raised in the adversary proceeding attacking the validity of the wrap mortgage.

42. *Each of the causes of action set forth in the adversary proceeding assert what are essentially state law claims which can be raised in the pending foreclosure action.*

43. The instant bankruptcy filing is nothing more than a two-party dispute which can, and should be, resolved in the State Court.

### Conclusions of Law

### DISMISSAL OF THE CHAPTER 11 PETITION

11. Many of the circumstantial factors which courts have identified as evidence of bad faith filing are present in the instant case:

(a) the debtor is a single asset entity;

(b) debtor has few unsecured creditors whose claims are small in relation to the claim of Seminole, the secured creditor were contemporaneous in nature, and capable of payment prior to the filing date;

(c) the debtor has few employees;

(d) the debtor's single asset is the subject of a pending state court foreclosure action;

(e) *the debtor's financial problems essentially involve a two-party dispute which can be resolved in the pending state court foreclosure action;*

(f) the timing of the debtor's filing is evidence of an attempt to delay or frustrate the legitimate efforts of Seminole as a secured creditor.

12. An important factor to consider in determining whether a chapter 11 case was initiated in good faith is *whether the reorganization effort essentially involves a two-party dispute which can be resolved in a non-bankruptcy forum.*

13. *Where there is pending litigation between two parties which can be resolved in the state court using state law, the bankruptcy court is not the appropriate forum for the case.*

15. The debtor's adversary proceeding claims seeking to attack the validity of the wrap mortgage as a fraudulent conveyance are cognizable under state law pursuant to the New York State Debtor and Creditor Law. Debtor and Creditor Law sections 273–276.

16. The debtor's adversary proceeding claims seeking to equitably subordinate the wrap mortgage are state law claims for breach of fiduciary duty by a director or in the context of a "shareholder derivative" suit under the Business Corporation Law of New York State. Business Corporation Law section 626.

17. *The debtor's adversary proceeding alleging fraudulent conveyance claims, equitable subordination claims and breach of fiduciary claims are all cognizable in the State Court in defense of the foreclosure action or as counter-claims in the foreclosure action.*

18. The debtor's purpose in filing for relief pursuant to Chapter 11 of the Bankruptcy Code was to litigate here *what are essentially state law causes of action; these can be resolved in state court.* (emphasis supplied).

3. *Can the Two Principal Causes of Action in the Adversary Proceeding Be Pursued in State Court?*

a) *The Debtor's Section 544(b) Claim*

The first four claims in the adversary proceeding complaint allege causes of action based on various themes of fraudulent conveyances, both under Section 544(b) of the Bankruptcy Code and the New York Statute Debtor and Creditor Law Sections 273, 274, 275 and 276. As stated above, the Bankruptcy Judge disposed of these claims in one paragraph in the conclusions of law:

15. The debtor's adversary proceeding claims seeking to attack the validity of the wrap mortgage as a fraudulent conveyance are cognizable under state law pursuant to the New York State Debtor and Creditor Law. Debtor and Creditor Law sections 273–276.

A review of the applicable sections of the New York State Debtor and Creditor Law reveals that these claims can be pursued only by a creditor. For example, Section 273 reads as follows:

Section 273. Conveyance by insolvent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent *is fraudulent as to creditors* without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration. (emphasis supplied).

Similarly, Sections 274, 275 and 276 also expressly state that these remedies are for the benefit of creditors or persons who become creditors. Thus, it is clear that the Debtor could find no solace in the State Court based on the pleaded sections of the New York Debtor and Creditor Law. For that matter, the Debtor could not pursue these New York Debtor and Creditor claims in the adversary proceeding. However, in the adversary proceeding, coupled with the New York Debtor and Creditor Law allegation is the claim of the Debtor that it is entitled to relief under the provisions of Section 544(b) of the Code, which provides:

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(03) of this title.

Pursuant to this section of the Code, the trustee may set aside a transfer of a Debtor's interest in property that is voidable under applicable state or federal law, by a creditor holding an actual unsecured claim. *In re Fair*, 142 B.R. 628 (Bankr.E.D.N.Y. 1992). Section 544(b) requires proof that a fraudulent conveyance took place under the New York Debtor and Creditor Law. However, while the Debtor cannot pursue such a claim in a New York court, as stated above, in the Bankruptcy Court the trustee steps into the shoes of a creditor and can pursue the fraudulent conveyance claims under the New York Statute. To do so, however, the trustee must demonstrate that there existed an actual unsecured creditor at the time of the transfer—in this case the granting of the Wrap Mortgage—whose shoes the trustee may step into so as to avoid the transfer under applicable state law. *In re Cardon Realty Corp.*, 146 B.R. 72, 77 (Bankr. W.D.N.Y.1992); *In re O.P.M. Leasing Services, Inc.*, 40 B.R. 380, 393 (Bankr.S.D.N.Y. 1984); See also *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931).

This rule was set forth in the case of a real estate mortgage in *In re Hecht*, 51 B.R. 72, 76 (Bankr.D.Vt.1985), as follows:

By virtue of such a fraud the Trustee seeks, under Section 544 of the Bankruptcy Code, to avoid the real estate mortgage received by Atlas and assigned by him to Gateway Mortgage Corp. Section 544 gives the trustee the rights of a hypothetical lien creditor as of the commencement of the case, and subparagraph (b) of this section confers upon the trustee, with certain re-

strictions, the power to avoid any of the debtor's transfers or obligations that are voidable for fraud or any other reason under applicable state or federal law. Voidability, therefore, is not automatic but must be asserted, and is to be determined wholly by the applicable law, federal or state. The trustee has no independent power of avoidance, but may act only upon the rights of at least one unsecured creditor holding an allowable claim, against whom the transfer or obligation was invalid under such law. The creditor, however, need not have reduced his claim to a lien or judgment. The transfer is voidable in its entirety to the extent necessary to benefit the estate and the recovery is for the benefit of all creditors holding unsecured claims.

Unfortunately, the Bankruptcy Judge did not render an opinion addressing this issue. In addition there is no specific finding or conclusion with regard to Section 544(b), except the reference in Paragraph 15, that such claims are cognizable under state law pursuant to New York Debtor and Creditor Law Sections 273 through 276.

 In moving to dismiss the Chapter 11 case, Seminole had the burden of proof. Was there an unsecured creditor who actually existed at the time the allegedly fraudulent conveyance occurred? The record is barren of any such proof, one way or the other. However, since the Bankruptcy Court relied so heavily on the ability of the Debtor to be able to adjudicate these issues in the State Court, which conclusion was erroneous, the Debtor should have the right and the opportunity to have the trustee present a Section 544(b) cause of action in the Bankruptcy Court, the only forum available for this cause of action.

b) *The Debtor's Equitable
Subordination Claim*

 A claim for equitable subordination must be brought by an adversary proceeding in the Bankruptcy Court. Fed. Bankr.P. 7001(8); *In re Danbury Square Associates,* 153 B.R. 657 (Bankr.S.D.N.Y. 1993). As to standing, "as a general rule, a proceeding to subordinate a claim may be initiated only by a trustee or a debtor-in-possession, unless a bankruptcy court authorizes another party in interest to initiate such a proceeding." *In re Mayo,* 112 B.R. 607 (Bankr.D.Vt.1990).

In the seventh claim for relief in the adversary proceeding complaint, the Debtor seeks to subordinate the Seminole Wrap Mortgage to another claim or interest in the bankrupt estate and to transfer the Seminole interest or lien to the estate. In effect, among other things, the Debtor apparently seeks to subordinate the Seminole interest in the Wrap Mortgage to the equity interests of the 58 debtor shareholders.

Section 510(c) of the code provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

"It is well established that a bankruptcy court has the authority to subordinate claims on equitable grounds." See *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); (*Matter of Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980); *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977).

 The proper test in a subordination case, as set forth in *Mobile and Multiponics,* is as follows:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In the Matter of Mobile Steel Co.,* 563 F.2d at 700 (citations omitted). In connection

with (i), as in this case, the inequitable conduct which must be shown need not necessarily be related to the acquisition or assertion of the claim. *Id.*

(See also *Westgate–California Corp. v. First National*, 650 F.2d 1040 [9th Cir.1981] ).

■ The basis for these rules of equitable subordination is that the bankruptcy court has the equitable power and the duty "to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. at 303, 60 S.Ct. at 243.

■ Under the first element, inequitable conduct, three categories of inequitable conduct have been recognized, namely 1) fraud, illegality and breach of fiduciary duties; 2) substitution of debt for capital when a company is undercapitalized; and 3) the claimant's use of the debtor as its alter ego instrumentality. *In re Missionary Baptist Foundation of America*, 712 F.2d 206, 212 (5th Cir.1983); *In re Beverages International Ltd.*, 50 B.R. 273, 281 (Bankr.D.Mass.1985).

■ As stated in *In re EMB Associates, Inc.*, 92 B.R. 9 (Bankr.D.R.I.1988), "the fundamental aim of equitable subordination is to undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results". *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 800 (8th Cir.1944).

■ Also, as pointed out in *In re EMB Associates, Inc.* at 15, this case may involve the conduct of fiduciaries or insiders, as related to the transaction between the Debtor and Seminole. The Code defines an insider as an officer, director or person in control of the debtor. 11 U.S.C. Section 101(30)(B). However, this definition is merely illustrative and the term insider should be flexibly applied on a case by case basis. *In re Huizar*, 71 B.R. 826, 831 (Bankr.W.D.Tex. 1987). Looking at the legislative history, "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 311–314 (1977); "A creditor who does not deal at arms length with the debtor but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider." *In re F & S Central Mftg.*, 53 B.R. 842, 848 (Bankr.E.D.N.Y. 1985).

■ However, even as to a non-insider, the doctrine of equitable subordination does not necessarily require proof in the nature of classic common law fraud. As stated in *In re Mayo*, 112 B.R. 607 (Bankr.D.Vt.1990);

The degree of misconduct that an objectant must show in the case of a non-insider is difficult to state with any precision. The most obvious offending conduct is outright fraud. *Something less than fraud will suffice, however, to bring the doctrine into play.* *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 720 (5th Cir.1980). Very substantial misconduct involving moral turpitude or gross misconduct amounting to overreaching, *Matter of Teltronics [Services, Inc.]*, *supra*, 29 B.R. [139] at 169 [Bankr.E.D.N.Y. 1983], have also brought the doctrine into play. The distinction between "inequitable conduct" and "gross misconduct" is difficult to apply in practice. There are few cases in which gross misconduct has actually been applied to non-insiders, and even fewer where inequitable misconduct has caused a claim to be subordinated.

The difficulty with the doctrine of equitable subordination is that its application requires rough justice from us. The doctrine is remedial and not penal. *See, i.e., Trone v. Smith (In re Westgate California Corp.)*, 642 F.2d 1174, 1178, 7 BCD 705 (9th Cir.1981); *Matter of Mobile Steel Corp.*, *supra*, 563 F.2d at 701. The facts of this adversary proceeding do not require us to bright line the decree of conduct.

Once inequitable conduct has been found, the next criteria is to determine whether the claimant's conduct resulted in either injury to the debtor or other creditors or in an unfair advantage to the claimant. *Matter of Mobile Steel Corp.*, *supra*, 563 F.2d at 700–01. For one creditor to have achieved an unfair advantage there must

have been a benefit. It must then be shown that such unfair advantage hurt the debtor or its creditors. Without the harm there would be no reason to apply equitable subordination to the claim.

The third criteria is simply a warning which acknowledges a Bankruptcy Court's equitable powers. A Bankruptcy Court is not free to adjust a legally valid claim merely because it perceives an equitable result. (emphasis supplied).

■ In addition, even if the Debtor's Chapter 11 proceeding was allowed to continue in the Bankruptcy Court, if the State Court foreclosure action is permitted to proceed to its inevitable conclusion, it could of course obviate any claim in the Bankruptcy Court for equitable subordination. "Equitable subordination is only a remedy in a bankruptcy court if the trustee has funds to distribute. If there is going to be no bankruptcy distribution, equitable subordination is meaningless." *In re Danbury Square Associates,* 153 B.R. 657 (Bankr.S.D.N.Y.1993).

■ In this case, the Debtor has been summarily deprived of the right to try its equitable subordination claim on the merits in the only available forum, the Bankruptcy Court. This resulted in the deprivation of a significant right on behalf of the Debtor. The right to equitable subordination in a bankruptcy proceeding is so important that it has been adjudicated as a defense to a motion for relief from the automatic stay. In *In re Danbury Square Associates Limited Partnership,* 150 B.R. 544 (Bankr.S.D.N.Y.1993), it was held:

> The issue of equitable subordination raised by the counterclaim is so inextricably connected with Aetna's right to foreclose upon its lien that it would prejudice the trustee's position if the proceeding were determined only by the allegations in the complaint. Mandatory abstention as to Aetna's foreclosure action would result in the trustee's loss of the claim for equitable subordination of Aetna's lien should Aetna's foreclosure action be allowed to proceed in the state court. Equitable subordination pursuant or 11 U.S.C. Section 510(c) is a bankruptcy remedy peculiar to the equitable jurisdiction of the bankruptcy court

and cannot be severed from, and exist independently of, a lien or claim which will not be determined in the bankruptcy court. Thus, in *In re Poughkeepsie Hotel Associates Joint Venture,* 132 B.R. 287 (Bankr. S.D.N.Y.1991), it was held that the bankruptcy court should hear an equitable subordination claim under 11 U.S.C. Section 510(c) as a defense to a motion for relief from the automatic stay because otherwise the equitable subordination claim would be lost if relief were granted without consideration of the equitable subordination claim on its merits.

The notion of equitable subordination, as embodied in Code Section 510(c), is peculiar to bankruptcy law and an issue which can only be decided in a bankruptcy setting.

. . . . .

. . . If the automatic stay is terminated and the movant allowed to foreclose, the estate would be deprived of these defenses in the nonbankruptcy forum. *Poughkeepsie Hotel,* 132 B.R. at 292.

. . . . .

In the instant case, the equitable subordination claim may not be heard in this court if the foreclosure action is remanded to a state court where a judgment of strict foreclosure would be entered.

Finally, as to the third element of equitable subordination, the Debtor's claim in this case is not inconsistent with the Bankruptcy Code. If the Debtor's allegations are substantiated, then Seminole's enforcement of the Wrap Mortgage would appear to be contrary to the principles of equitable subordination.

Unfortunately, in this adversary proceeding claim for equitable subordination, these elements were raised, but never adjudicated on the merits. The adversary proceeding will provide both parties "a single, expeditious forum for resolution of all disputed issues". *In re Sonnax Industries,* 907 F.2d 1280, 1287 (2nd Cir.1990). Based on these principles and the law of equitable subordination, the facts of the case, including the close relationships involving the creation of the

Debtor and the Wrap Mortgage, a trial on the merits of the Debtor's equitable subordination claim is required.

### 4. *The Chapter 11 Dismissal in this Case*

■ In his conclusions of law, the Bankruptcy Judge clearly revealed his reasons for dismissing the Chapter 11 proceeding. His decision was based, in large measure, on his view that: "the reorganization effort essentially involves a two-party dispute which can be resolved in a non-bankruptcy forum"; "which can be resolved in the state court using state law"; "the debtor's adversary proceeding alleging fraudulent conveyance claims, equitable subordination claims and breach of fiduciary claims are all cognizable in the State Court in defense of the foreclosure action or as counter-claims in the foreclosure action"; and, "accordingly, the court finds, that by virtue of the foregoing, the debtor's Chapter 11 petition lacks good faith and should be and is dismissed."

As stated above, the Bankruptcy Court erred in concluding that this two-party dispute "can be resolved in a non-bankruptcy forum" ..., which can be resolved in the state court using the state law and that the "fraudulent conveyance claim and equitable subordination ... are all cognizable in state court." On the contrary, the Debtor and Creditor Law fraudulent conveyance claims are not cognizable to a non-creditor and the equitable subordination claim is solely a Bankruptcy Court remedy. Since these erroneous conclusions were a major reason to support the Court's finding of lack of good faith, a reversal of the decision to dismiss the Chapter 11 proceeding is required.

■ In addition, the Court finds that this is not the usual "single asset debtor" case frequently seen in the Bankruptcy Court. In such cases, the debtor is unable to meet operating expenses and debt and mortgage payments. In the usual scenario, Chapter 11 is triggered when the mortgagee commences a foreclosure action, and the debtor attempts to obtain a stay in the Bankruptcy Court. However, even this strategy is permissible. "There is nothing improper in a single asset debtor filing a Chapter 11 Petition for Reorganization, even shortly before or after a foreclosure proceeding has been commenced", *In re Tiffany Square Assoc.,* 104 B.R. 438, 441 (Bankr.M.D.Fla.1989). See also *In re Colonial Daytona Ltd. Partnership,* 144 B.R. 924 (Bankr.M.D.Fla.1992). In sum, "there is nothing inherently improper for a Debtor with one single asset to attempt to reorganize its affairs under the rehabilitative provisions of the Bankruptcy Code", *In re Clause Enterprises of Fort Myers, Ltd.,* 150 B.R. 476, 478 (Bankr.M.D.Fla.1993). See also *In re D & W Realty Corp.,* 156 B.R. 140, 143 (Bankr.S.D.N.Y.1993).

■ Further, the Court notes the standard with regard to a bad faith dismissal set forth in *Carolin Corp. v. Miller,* 886 F.2d 693, 694 (4th Cir.1989):

> We hold that a bankruptcy court may dismiss such a petition for want of good faith in its filing, but only with great caution and upon supportable findings both of the objective futility of any possible reorganization and the subjective bad faith of the petitioner in invoking this form of bankruptcy protection.

■ In this case, the Bankruptcy Court did not make any finding or conclusion concerning the important factor of the objective feasibility of the attempted reorganization. The Court finds that, in this case, the Debtor's attempt to reorganize its affairs under the rehabilitative provisions of the Code could be objectively feasible. Here, the Debtor's operations generate substantial income, it has cash reserves, the property itself is well maintained, and it has a reasonable chance to refinance the Wrap Mortgage. Superimposed on this optimistic picture is the Debtor's opportunity to rehabilitate, bolstered by its attempt to subordinate all or part of the Wrap Mortgage because of alleged overreaching, inequitable conduct and breach of fiduciary duty by alleged insiders. The Debtor owns a valuable piece of income producing real property, had substantial cash reserves, and sufficient cash flow to meet current expenditures. It was forced to seek Chapter 11 protection because of the Wrap Mortgage, which it claims should be subordinated. It should be given the opportunity to

try its claim on the merits in the Bankruptcy Court.

Accordingly, the order dismissing the Debtor's Chapter 11 petition is reversed, the dismissal is vacated and the Chapter 11 petition is reinstated.

### D. *As the Continuation of the Receiver in Possession and Control of the Debtor's Building*

 Seminole also moved for an order, pursuant to 11 U.S.C. Section 543(d)(1) permitting the state court receiver to continue in possession, custody and control of the Debtor's building. The Bankruptcy Judge granted this motion and continued the state court receiver in possession and control of the property. Since the Court has reinstated Debtor's chapter 11 petition and this matter will be remanded to the Bankruptcy Court to resolve all the pending proceedings, including the adversary proceeding, the Court declines to remove the state court receiver at this time. The Court directs the Bankruptcy Court to make this determination, based on the totality of the circumstances created by this decision.

### E. *As to Relief from the Automatic Stay*

Seminole also moved for an order, pursuant to 11 U.S.C. Section 362 granting it relief from the provisions of the automatic stay to continue the foreclosure action commenced in the state court. The Bankruptcy Court declined to rule on this request in view of its decision to dismiss the chapter 11 petition. Based on the decision of this Court, Seminole's motion to obtain relief from the automatic stay, is denied.

### CONCLUSION

The decision of the Bankruptcy Court dismissing the Debtor's chapter 11 petition is reversed and that petition is reinstated. The decision of the Bankruptcy Court to continue the state court receiver is affirmed on condition that it will be reviewed by the Bankruptcy Court, in view of the terms of this decision. Seminole's motion for relief from the automatic stay is denied.

The Clerk of the Court is advised that this Order closes case no. 93–CV–4342.

SO ORDERED.