**OFFICIAL COMMITTEE OF AS-BESTOS CLAIMANTS OF G–I HOLDING, INC., Plaintiff,**

**v.**

**Samuel J. HEYMAN, Defendant.**

**No. 01 Civ. 8539 (RWS).**

United States District Court,
S.D. New York.

April 8, 2002.

Caplin & Drysdale, Chartered, Washington, DC, by Trevor W. Swett, Kimberly N. Brown, of counsel, Elihu Inselbuch, Rita C. Tobin, New York City, for Plaintiff.

Simpson Thacher & Bartlett, New York City, by Barry R. Ostrager, Mark Thompson, David J. Woll, of counsel, for Defendant.

## OPINION

SWEET, District Judge.

Defendant Samuel J. Heyman ("Heyman") moves pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint of the Official Committee of Asbestos Claimants of G–I Holdings (the "Committee") for failure to plead fraud with particularity and failure to state a cause of action.

For the foregoing reasons, that motion is denied.

### Parties

The Committee is a committee of creditors appointed by the United States Trustee pursuant to 11 U.S.C. § 1102(a). The Committee is made up of persons who assert claims against G–I, as successor to GAF Corporation ("GAF"), by reason of personal injuries or wrongful death caused by asbestos-containing products.

Heyman is the former chairman and chief executive officer of GAF and is an individual who is a citizen of the State of New York.

### Facts

The following facts are taken from the Committee's complaint and documents referred to therein.

### I. The 1997 Transactions

As of December 31, 1996, GAF was the top-tier holding company in a corporate group that contained two principal operating businesses: (1) ISP, a manufacturer of specialty chemicals and mineral products; and (2) Building Materials Corporation of America ("BMCA"), a manufacturer of roofing and building products. GAF was a privately held company at the time. It later merged with an affiliate known as G–I Holdings, Inc. ("G–I").

At that time, GAF owned 100% of a company named ISP Holding, Inc. ("ISPH"), which in turn owned approximately 83.5% of the ISP stock. The remaining ISP stock was publicly held. In its SEC Form 10–K for 1996, ISP and subsidiaries reported net income of $80.6

million, total assets of $1.3 billion and shareholders' equity of $701.4 million.

BMCA reported net income of $17 million, total assets of $701.6 million, and shareholder's equity of $143.2 million in its Form 10–K for 1996.

With effect as of January 1, 1997, GAF distributed to GAF's shareholders, for no consideration, 100% of the capital stock of ISPH. Heyman received approximately 96% of the shares, and the minority shareholders of GAF received the remaining 4%. At ISP's closing price on December 31, 1996, the stock that GAF disposed of in the transfer was worth about $1 billion, $988,391,250 of which Heyman received directly or indirectly.

ISP was merged into ISPH on July 15, 1998, and the surviving entity took the name of International Specialty Products, Inc. ("New ISP"). After that merger, Heyman owned, directly or indirectly, at least 76% of the stock in New ISP. Heyman continues to own, directly or indirectly, the controlling interest in New ISP, which is now the direct owner of the assets and business formerly owned by ISP.

Although the transfer severed the parent/subsidiary relationship between ISP and GAF as a matter of corporate form, ISP remained closely connected with its former affiliates in the GAF group as a matter of substance. Both before and after the transfer, Heyman held a controlling interest, indirectly, in ISP, BMCA, and GAF's other subsidiaries; ISP managed GAF and its subsidiaries through a management contract; and ISP supplied BMCA with colored roofing granules, a product essential to one or more of BMCA's product lines.

### GAF's Asbestos Liabilities

Beginning in the late 1970's, large numbers of claimants began to bring lawsuits seeking compensation for bodily injury, death and related harms inflicted by asbestos and products containing asbestos. By the mid–1980's, GAF and other producers of asbestos and asbestos-containing products were engaged in mass tort litigation in courts throughout the United States.

Heyman acquired GAF, then a publicly held company, in 1983. In 1989, Heyman and a small management group acquired GAF in a leveraged buyout and "going private" transaction. According to its SEC Form 10–K for the year ended December 31, 1989, GAF by then had been sued in approximately 111,000 asbestos-related suits for personal injury or wrongful death, of which 53,000 had been resolved by settlement or judgment, and 58,000 remained pending.

Seeking for a means of resolving the mass tort litigation, a group of asbestos defendants, including GAF, formed the Center for Claims Resolution, Inc. (the "CCR"), as a non-profit corporation in September 1988. Pursuant to an agreement dated September 28, 1988, and amended effective February 1, 1994, GAF designated the CCR as its sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims. GAF remained a CCR member until January 17, 2000.

### A. The Georgine Settlement

In 1993, the members of CCR, including GAF, entered into a settlement agreement with representatives of a proposed class consisting of future asbestos claimants. Those claimants are those persons who had been exposed to asbestos but had not yet filed asbestos-related lawsuits against any CCR member. The proposed settlement led to the filing of a settlement class action in the United States District Court for the Eastern District of Pennsylvania.

Originally styled *Carlough v. Amchem Products, Inc.*, it later proceeded under the caption of *Georgine v. Amchem Products, Inc.* The related settlement, which was never consummated, is referred to as the "Georgine Settlement."

Each of the elements in the Georgine Settlement tended to cabin GAF's liability for future asbestos claims within contractual limits that did not apply as a matter of tort law.

The District Court presiding over *Georgine* entered a preliminary injunction barring asbestos claimants from filing or prosecuting asbestos claims against the settling defendants except in accordance with the Georgine Settlement. On August 16, 1994, the District Court certified the class and approved the class action settlement over the objections of a number of asbestos claimants.

The objecting parties appealed. On May 10, 1996, the United States Court of Appeals for the Third Circuit overturned the decision of the District Court. *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir.1996).

The Supreme Court granted certiorari in the matter on November 1, 1996. *Amchem Products v. Windsor*, 519 U.S. 957, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996). On June 25, 1997, the Supreme Court affirmed the Third Circuit's decision and refused to reinstate the Georgine Settlement. *Amchem Products v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).[1]

At the end of 1996, approximately 282,900 tort suits for asbestos-related personal injuries had been filed against GAF. GAF had resolved all but approximately 59,400 of these suits by December 31, 1996.

At that time, GAF had created an Asbestos Reserve. That reserve was calculated by estimating (1) the total cost of resolving all pending and future asbestos claims through the initial ten-year term of the Georgine Settlement; (2) the insurance available for defending against and paying claims; and (3) anticipated tax benefits arising from the asbestos litigation. GAF estimated that its total cost of resolving the asbestos claims was $576 million. GAF arrived at a $333.8 million figure for its Asbestos Reserve after subtracting an estimated $190.5 million in insurance policies and $51.7 million in deferred tax benefits from the estimated total cost. That figure took no account of future asbestos claims to the extent such claims would be asserted after the initial ten-year term of the Georgine Settlement, or of claims in the event the Georgine Settlement was not affirmed. GAF acknowledged at this time that unless the Supreme Court upheld the Georgine Settlement, GAF could be required to increase the estimate of its asbestos-related liability to an undetermined amount.

At the end of 1997, GAF had resolved 11,000 claims, at an average cost of $3,700, for a total expenditure of $40.7 million. By the close of 1998, GAF had resolved 59,000 claims, at an average cost of $3,500, for a total expenditure of $206.5 million.

---

**1.** In *Amchem,* the Supreme Court held that the Georgine Settlement did not meet the criteria for certification under Fed.R.Civ.P. 23. The proposed class was comprised of "exposure-only" individuals who, at the time of the settlement, had been exposed (or whose spouse or family member had been exposed) to asbestos or an asbestos-containing product attributable to one of the settlement defen-

dants, but who did not have a pending lawsuit related to that exposure. The settlement was designed to compensate future claimants that actually suffered sickness or injury as a result of asbestos exposure and established an administrative mechanism and schedule of payments to compensate class members who met defined asbestos-exposure and medical requirements. *Id.* at 603–04, 117 S.Ct. 2231.

An additional 113,800 claims were pending at the end of 1998.

## B. Nettles v. Heyman

On January 3, 2000, *Nettles v. Heyman,* No. 00 Civ. 0035, was filed against Heyman. Nettles brought suit in his own behalf and in behalf of a proposed class consisting of all present and future asbestos claimants against GAF, and demanded, *inter alia,* the setting aside of the transfer and return of ISP to GAF's estate for the benefit of all creditors.

Heyman moved to dismiss the *Nettles* complaint for lack of subject matter jurisdiction and lack· of standing pursuant to Fed.R.Civ.P. 12(b)(1) and (6). The Honorable Naomi Reice Buchwald denied this motion on August 18, 2000 without prejudice. *Nettles v. Heyman,* 2000 WL 1182808 (S.D.N.Y.2000). Judge Buchwald held that plaintiff's allegations failed to demonstrate that his claim satisfied the $75,000 jurisdictional amount-in-controversy requirement. She also questioned whether the complaint satisfied constitutional standing requirements, in that the complaint no where alleged that Nettles had been or would be harmed by the 1997 transactions. Judge Buchwald directed the parties to conduct discovery relating to the jurisdictional issue and deferred full consideration of the standing requirement.[2] The discovery revealed that the amount was not sufficient to confer federal jurisdiction.

On October 23, 2000, the plaintiffs requested leave to file an amended complaint, adding thirteen new plaintiffs. Heyman opposed the motion on December 18, 2000, noting that leave of court was required and the amendment would not cure the jurisdictional defects.

The *Nettles* lawsuit was dismissed by order dated May 4, 2001, with leave to refile upon the resolution·of GAF's Bankruptcy Case.

## C. Stewart v. Heyman

Plaintiff's counsel filed another class action, *Stewart v. Heyman,* on December 26, 2000. The *Stewart* plaintiffs sued on behalf of themselves and for a proposed class of present and future asbestos claimants against GAF, and they prayed for the setting aside of the transfer and restitution of ISP to GAF, among other remedies. That complaint was never served.

## D. CCR v. Heyman

The Center for Claims Resolution ("CCR") commenced a lawsuit on September 18, 2000, challenging the 1997 Transactions. *CCR v. Heyman,* Index No. 604002/2000 (Sup.Ct.N.Y.County). According to CCR's complaint, as of January 1, 1997, the effective date of the transfer, GAF owed more than $68 million in existing and contingent liabilities to the CCR. These consisted of (1) an outstanding balance of $10.2 million on GAF's account with the CCR; (2) $55.3 million for GAF's share of pending settlements, which amount had not yet been billed by the CCR but was known to GAF; and (3) $2.8 million for GAF's share of settlements that were to be consummated in January 1997, of which GAF was aware. According to the complaint, GAF's debt to CCR stood at $296.5 million as of September 2000.

### The Current Proceeding

G–I filed for bankruptcy protection on January 5, 2001. The Bankruptcy Court

---

**2.** The Court expressly rejected, however, Nettles's claim that he had standing merely by virtue of the fact that he alleged that he qualified as a potential creditor under New York's Debtor and Creditor Law. "[T]his state statute cannot confer on plaintiffs standing in federal court that is otherwise forbidden by Article III." *Id.* at n. 7.

authorized the Committee pursuant to 11 U.S.C. § 544(b) to pursue claims against Heyman arising out of the 1997 transactions. With this authorization, the Committee is entitled to void the 1997 transactions for the benefit of G–I's estate if it would be voidable by a single creditor had there been no bankruptcy.

The Committee filed the instant lawsuit on September 17, 2001. The complaint alleges that the unsecured creditors from whom the Committee derives its avoidance rights include, but are not limited to, asbestos personal injury claimants (including but not limited to the named and unnamed plaintiffs in *Nettles* and *Stewart*), CCR, and the United States Environmental Protection Agency.

Heyman filed the instant motion to dismiss on December 13, 2001. In it, he argues that (1) Counts I, II, III, and IV alleging fraudulent conveyance should be dismissed because any unsecured creditors would be barred by the statute of limitations; (2) Counts I, II, III, and IV fail to establish the existence of an unsecured creditor holding an allowable claim under the Bankruptcy Code; (3) Counts I and II are facially deficient because they fail to establish the existence of a creditor under the New York Debtor and Creditor Law; (4) Count IV fails to allege actual fraud with particularity; and (5) Counts V and VI alleging breach of fiduciary duty are facially deficient. The motion was heard and marked submitted on February 6, 2002.

## DISCUSSION

### I. *Jurisdiction*

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334(b).

### II. *Article III Standing*

■ The issue of standing, as a jurisdictional issue, must be addressed at the outset of proceedings. *In re Mediators Inc.,* 190 B.R. 515, 526 (S.D.N.Y.1995) (*citing Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

The Committee has standing to seek avoidance of the transfer only if it can prove the existence of an unsecured creditor with an allowable claim. Heyman's challenges to creditor standing will be addressed later, in discussing whether the Committee successfully proved the existence of an unsecured creditor with an allowable claim.

The Committee also has standing to sue for breach of fiduciary duty. *In re Mediators,* 105 F.3d 822, 826–27 (2d Cir.1997) (likening unsecured creditors committees to bankruptcy trustee and stating that trustee can sue debtor's fiduciaries for breach of duties) (*citing In re Keene Corp.,* 164 B.R. 844, 853 (Bankr.S.D.N.Y.1994) ("Section 720 of New York's Business Corporation Law expressly authorizes a corporation or bankruptcy trustee to sue the corporation's officers and directors for breach of fiduciary duty, including misappropriation or diversion of assets")).

### III. *Rule 12(b)(6) Motion to Dismiss*

■ In reviewing a motion to dismiss under Rule 12(b)(6), courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993)). Review must be limited to the complaint and documents attached or incorporated by reference thereto. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). In this context, the Second Circuit has held that a complaint is deemed to "include ... documents that the

plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000). However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986).

## IV. *Section 544(b) Claims*

■ The Committee brings this lawsuit pursuant to Section 544(b), which provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable...." 11 U.S.C. § 544(b). The trustee or debtor in possession "can use this power only if there is a valid unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action." *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir.2000).

■ "Under section 544(b), the trustee succeeds to the rights of an [allowed] unsecured creditor in existence at the commencement of the case who can avoid the transfer or obligation under applicable state or local law. If there are no creditors against whom the transfer is voidable under the applicable law, the trustee is powerless to act under section 544(b)." 5 L. King, *Collier on Bankruptcy*, ¶ 544.09, at 544–17 (15th ed. rev.1999). The burden is on the trustee to demonstrate the existence of an actual creditor with a viable cause of action against the debtor which is not time-barred or otherwise invalid. *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837 (E.D.N.Y.1995). The principal purpose of section 544(b) of the Bankruptcy Code "is to undo pre-petition transfers of property that remove or withhold that property from the estate to the prejudice of creditors." *SIPC v. Stratton Oakmont Inc.*, 234 B.R. 293, 311 (Bankr.S.D.N.Y. 1999). "Section 544, however, contains no original substantive provisions to determine when a prepetition transfer is voidable; instead it incorporates and make applicable non-bankruptcy law, which in the present case is the [New York Debtor and Creditor Law]." *Id.* (citations omitted).

### A. *Statute of Limitations* [3]

#### 1. *Choice of Law*

It is unclear whether a federal court, exercising its bankruptcy jurisdiction under 28 U.S.C. § 1334(b) over state law claims should apply its own federal choice-of-law rules, or—as in diversity cases—

---

**3.** Heyman raised the statute of limitations argument as to the fraudulent transfers underlying the avoidance claim only in his reply brief. That fact is alone grounds for disregarding it. *Pereira v. Cogan*, No. 99 Civ. 619, 2001 WL 243537 at *14 n. 17 (2001). However, given the extensive "bites at the apple" given to both sides on this motion, the issue

will be addressed. This is so even though Heyman appeared to withdraw his argument as to statute of limitations in his response to the plaintiff's surreply—a withdrawal followed by continued argument on the point. It can be presumed that his withdrawal was mere rhetorical flourish.

those of the state in which it sits. *In re Morse Tool, Inc.*, 108 B.R. 384, 385 & n. 1, n. 2 (Bankr.D.Mass.1989) (collecting cases); *see also* Thomas H. Day, Solution for Conflict of Laws Governing Fraudulent Transfers, 48 Business Lawyer 889, 891–92 (1993). This Court addressed the issue in *Pereira v. Cogan*, 2001 WL 243537 (S.D.N.Y. March 8, 2001) and applied New York's choice-of-law rules to determine the applicable statute of limitations in a case brought under § 1334(b). *See also National Paragon Corp. v. Aberman*, 1988 WL 7827 (E.D.Pa. Feb. 2, 1988) (applying Pennsylvania's choice of law rules in case brought under 1334(b)).

■ New York's choice of law rules for statutes of limitations is set forth in its "borrowing statute," which provides that where a plaintiff is a New York resident, the New York statute of limitations applies, and where a plaintiff is not a New York resident, the court should apply the shorter of New York's period of limitations or the statute of limitations applicable where the plaintiff resides. N.Y. C.P.L.R. § 202 (McKinney 2000). When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation, it is the residency of the corporation which is applicable. *Allegaert v. Warren*, 480 F.Supp. 817, 820 n. 7 (S.D.N.Y.1979).

■ G–I Holdings maintains its principal place of business in New Jersey. Under New Jersey law, a four-year statute of repose is applied to fraudulent conveyance claims. N.J.S.A. § 25:2–31.[4] Because this period is shorter than New York's six-year

period, New York's borrowing statute mandates the application of New Jersey's four-year statute of repose. The four-year period began on January 1, 1997.

### 2. CCR's Complaint Was Timely Filed

The CCR filed its timely fraudulent conveyance action on September 19, 2000. Heyman alleges that this Court should disregard the CCR complaint because CCR was fully cognizant of the 1997 transactions at the time they took place. Heyman cites for this proposition to depositions taken in separate proceedings. On this motion, the four corners of the Committee's complaint and documents it references therein control. The CCR action has not been dismissed at the time of writing. Heyman's contentions as to the CCR complaint are therefore not addressed at this time.

On the basis of the facts alleged in the complaint, CCR timely filed a complaint. Heyman's motion to dismiss on this ground is denied.

### 3. Nettles and Stewart Class Members[5]

■ The *Nettles* and *Stewart* class actions were timely filed on January 3, 2000, and December 26, 2000. The question is whether these actions tolled the statute of limitations for all putative class members.

■ As a general rule, statute of limitations periods are suspended against putative class members from the time a class action is filed until class certification is denied, or, if state law applies and permits, upon decertification. *American Pipe and*

---

**4.** The statute provides that a cause of action with respect to a fraudulent transfer is extinguished unless the action is brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." N.J.S.A. § 25:2–31.

**5.** The existence of one creditor is sufficient to allow the Committee to proceed. However, this Court is addressing the viability of both CCR and potential asbestos class action members so that it will not have to address the issue in future opinions.

*Construction Co. v. Utah,* 414 U.S. 538, 553–54, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). In *American Pipe,* putative class members sought to intervene to pursue their individual actions after the trial court had denied class certification because the proposed class failed the numerosity requirement. *Id.* at 543–44, 94 S.Ct. 756. The Supreme Court ruled that the statute of limitations had been tolled for the members of the putative class by the commencement of the class action, and thus that purported members later seeking to intervene to assert their individual claims were not time-barred. *Id.* at 552–53, 94 S.Ct. 756.

■ The Supreme Court expanded the *American Pipe* rule to cover putative class members who file separate actions, rather than seek intervention, after class certification is denied. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). The reason is that absent putative class members are expected and encouraged to remain passive during the early stages of the class action and to "rely on the named plaintiffs to press their claims." *Id.* at 352–53, 103 S.Ct. 2392; *see also American Pipe,* 414 U.S. at 552, 94 S.Ct. 756. Not until a class is certified "does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it...." *Id.* An absent putative class member in an action where a class was never certified thus is not legally bound either by the named plaintiffs' choice of legal claims or by a dismissal for failure to allege sufficient facts to state a cause of action, even if that dismissal would have *res judicata* effect against the named plaintiffs. *Cullen v. Margiotta,* 811 F.2d 698, 719 (2d Cir. 1987) (*citing Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1314–15 (4th Cir.1978); *Roman v. ESB, Inc.,* 550 F.2d 1343, 1355–56 (4th Cir.1976)).

The *American Pipe* rule has been extended to statutes of repose. *Joseph v. Wiles,* 223 F.3d 1155, 1168 (10th Cir.2000) (holding that *American Pipe* applied to statute of repose); *In re Discovery Zone Sec. Litig.,* 181 F.R.D. 582, 600 n. 11 (N.D.Ill.1998) (finding that securities fraud class action "legally tolled" statute of repose); *Salkind v. Wang,* Civ. A. No. 93–10912–WGY, 1995 WL 170122, at *3 (D. Mass. March 30, 1995) (finding that "*American Pipe* does toll the ... bar of repose for as many of [plaintiff's] claims which are part of the class action against the same defendant(s) until the class is decertified or plaintiff opts out"); *Mott v. R.G. Dickinson & Co.,* No. 92–1450–PFK, 1993 WL 63445, at *5 (D.Kan. Feb. 24, 1993) (acknowledging that class action tolls statute of repose as to absent class members suing same defendant). *But see Lampf v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (holding equitable tolling does not apply to statute of repose); *Anixter v. Home–Stake Production Co.,* 939 F.2d 1420, 1434–35 (10th Cir.1991) (same), *vacated on other grounds sub nom., Dennler v. Trippet,* 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992); *Cacha v. Montaco, Inc.,* 554 S.E.2d 388, 392–93 (N.C.Ct.App.2001) (holding that court was bound by prior opinion of court to hold that *American Pipe* did not apply to North Carolina's statute of repose).

■ *Lampf* and *Anixter* are not relevant in the present context because the tolling that the Committee seeks is legal rather than equitable in nature. *Joseph,* 223 F.3d 1155, 1167–68. Equitable tolling is appropriate where, for example, the claimant has filed a defective pleading during the statutory period, *Burnett v. New York Cent. R.R. Co.,* 380 U.S. 424, 434–36, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), or where the plaintiff has been induced or

tricked by his adversary's misconduct into allowing the filing deadline to pass. *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). By contrast, the tolling of any putative class action member is the tolling that occurs any time an action is commenced and class certification is pending. *Joseph*, 223 F.3d 1155, 1167–68. Thus, the putative class members in *Nettles* and *Stewart* have "effectively [been] a party to an action against [Heyman] since a class action covering him was requested but never denied." *Id.* at 1168.

Tolling the limitations period while class certification is pending does not compromise the purposes of statutes of limitation and repose. Statutes of limitation are intended to protect defendants from being unfairly surprised by the appearance of stale claims, and to prevent plaintiffs from sleeping on their rights. *Crown, Cork*, 462 U.S. at 352, 103 S.Ct. 2392. "These ends are met when a class action is commenced." *Id.* Here, the claim was brought within this period on behalf of a class of which the potential claimants the Committee cites were members. Heyman was on notice of the substantive claim as well as the number and generic identity of potential plaintiffs. He cannot assert that the potential creditors' claims were stale or that they slept on their rights. Heyman's potential liability should not be extinguished simply because the district court left the class certification issue unresolved in *Nettles* and because GAF's bankruptcy petition stayed the *Stewart* complaint.

The *Nettles* class action was filed on January 3, 2000, on behalf of Nettles and a proposed class consisting of all present and future asbestos claimants against GAF and demanded the setting aside of the Transfer. The *Stewart* class action was filed on December 26, 2000, on behalf of named plaintiffs and for a proposed class of present and future asbestos claimants against GAF, praying for the setting aside of the transfer and restitution of ISP to GAF. While the *Nettles* case was dismissed without prejudice on May 4, 2001, the *Stewart* action remains on this Court's docket.[6] Therefore, the statute of repose has been tolled since January 3, 2000. Even if this Court were to dismiss the *Stewart* complaint today, the potential class members would still have almost another full year to come forward. Therefore, a large number of potential claimants are not time-barred.

The statute of repose should not, however, continue to run after the dismissal of a class action. Thus, if *Nettles* had been the only class action filed, the statute of repose would have begun running again after May 4, 2001, when the case was dismissed.

It is true that some courts, including the Second Circuit, have limited *American Pipe* out of concern for potential abuses. *E.g., Korwek v. Hunt*, 827 F.2d 874 (2d Cir.1987) (holding that *American Pipe* does not toll statute of limitations for filing of second class action); *Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir.1994) (in fifteen-year-old case, court concerned about potential for "endless rounds of litigation"). The current litigation *threatens* no such abuse. First, class certification was never denied in *Nettles* and *Stewart*. The Committee therefore is not attempting to "argue and reargue the question of class certification by filing new but repetitive complaints." *Korwek*, 827 F.2d at 879.

---

**6.** Heyman has asked this Court in the papers for this motion to dismiss the *Stewart* action because the complaint in *Stewart* was not served within the requisite 120 day window after the Bankruptcy Court lifted the stay. Upon the filing of an appropriate motion in that action, the issue will be addressed.

While this is a subsequent action to the class actions, it is not a case of the Committee "piggyback[ing] one class action onto another and thus toll[ing] the statute of limitations indefinitely." *Id.* at 878 (quotations omitted).

### B. *Creditors' Article III Standing*

■ The Supreme Court has identified three aspects of Article III standing: (1) an "injury in fact," which is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

Heyman challenges the Committee's showing of an "injury in fact" for potential asbestos class action members. He refers to dicta in Judge Buchwald's opinion in *Nettles* that a "state statute cannot confer on plaintiffs standing in federal court that is otherwise forbidden by Article III." 2000 WL 1182808, at *3 n. 7. Judge Buchwald focused on the fact that GAF had a reserve of $333.8 million to pay potential claimants in discussing whether the claimants could show that "GAF's financial moves ... have any ability to deprive him of his claim." *Id.* at *3. The Committee here has alleged that GAF had a reserve of $333.8 million, but also that GAF did not account for the possibility that the Georgine settlement would be rejected in arriving at that figure. Further, the complaint

alleged that by the close of 1998, $247.2 million of that reserve account had already been distributed and an additional 113,800 claims were still outstanding. Given an average payout of between $3,500 to $3,700, the remaining $86.6 million could cover less than 25,000 of the remaining claims.[7] That leaves a sizeable number of creditors who suffer or may suffer an injury in fact.

In addition, Heyman makes no challenge to the CCR's standing other than his general objections to that lawsuit, and these objections are not appropriate for consideration in a motion to dismiss.

### C. *Creditors Need Not File Proof of Claims to Have "Allowable Claims"*

■ Heyman argues that the motion should be dismissed because the complaint fails to establish the existence of an unsecured creditor with an allowable claim, because no creditor has filed a proof of claim against G–I.

Bankruptcy Rule 3002(a) states that "[a]n unsecured creditor or an equity security holder must file a proof of claim or interest for the claim or interest to be allowed." *See also In re Dennis,* 230 B.R. 244, 247 (Bankr.D.N.J.1999) ("[T]he Code clearly requires a proof of claim to be filed for a claim to be allowed...."); *In re Elmont Elec. Co.,* 206 B.R. 41, 43 (Bankr. E.D.N.Y.1997) ("Rule 3002(a) ... requires unsecured creditors and equity security holders to file proofs of claims in order for their claims or interests to be allowed [under 502(a) ]....").

---

7. Although the pot is limited to $333.8 million, that figure is based on paying out an estimated $576 million in claims. Even if GAF in fact can afford to pay all of the $576 million to claimants, that pot is still not large enough given the figures in the complaint.

Given the amount of money paid out by the end of 1998, only $328.8 million remained to cover the claims of approximately 113,800 persons. That is insufficient to cover average costs of even $2,900 for the claimants.

However, a number of courts have recognized the fact that filing a proof of claim is only required for a creditor to have voting and distribution rights. *In re Dennis*, 230 B.R. 244, 247 (Bankr.D.N.J.1999); *In re Stamford Color Photo*, 105 B.R. 204, 206 (Bankr.D.Conn.1989) (noting failure to file proof of claim does not extinguish viability of creditor's claim or "creditor" status but merely eliminates creditor's right to distribution). Courts have explicitly held that a creditor need not file a proof of claim to take advantage of other rights, such as moving to dismiss a bankruptcy petition, *In re Wells*, 227 B.R. 553, 559 n. 2 (Bankr.M.D.Fla.1998), and seeking determination as to the secured status of a third lienholder's claim. *In re Brager*, 28 B.R. 966 (Bankr.E.D.Pa.1983) ("[T]he filing of a claim is permissive only, and is not required.").

Heyman relies on *Campbell v. Deans (In re J.R. Deans Co.)*, 249 B.R. 121 (Bankr.D.S.C.2000). There, the court granted summary judgment because the plaintiff had failed to proffer a creditor with standing because the claimants had failed to file proofs of claim. *Id.* at 131. By contrast, the Honorable Denny Chin did not even address the issue of whether claimants had filed proofs of claims in another asbestos-injury related case, *Lippe v. Bairnco Corp.*, 225 B.R. 846 (S.D.N.Y. 1998) (denying summary judgment motion). There, the corporate defendants contended that the plaintiffs had failed to prove the existence of an actual creditor under 544(b). Although the plaintiffs had listed a number of groups of potential creditors, many of them were time-barred from pursuing their claims. Two groups were not time-barred, however. These groups were asbestos-victim claimants who were unaware of their injuries at the time of the disputed transfer and claimants who filed lawsuits against asbestos manufacturers before any injury had manifested itself to protect themselves from the running of the statute of limitations. "These individuals are actual creditors who have standing to attack the Transactions...." *Id.* at 855–56.

The result in *Campbell*, given the permissive nature of proofs of claims, raises a number of questions as to the time of filing as between the 544(b) action and the bankruptcy action.[8] *Campbell* will not be applied here in the class action context. It does not appear beyond doubt that the Committee can prove no set of facts to establish that a creditor will be able to file a proof of claim, should such a claim be required.[9] Heyman's motion to dismiss on this ground is denied.

Heyman also raises in his reply brief the issue that there are no allowable claims against GAF, because, at the time of the transfer in 1997, GAF Corporation had no

---

**8.** If proofs were required and a deadline had to be set, it would logically be the same deadline that the Bankruptcy Court arranges for filing proofs of claims. The bankruptcy suit here is in its infancy, and no bar date for filing proofs has been set. It is not as though the date for filing proofs has passed and creditors are unable to file proofs. In fact, as alluded to above, in many asbestos bankruptcies, no bar date if ever set. Approximately 113,800 claims were pending against GAF at the end of 1998. Surely one of them will become a creditor of GAF and will be able to file a proof of claim.

**9.** Heyman also states that the complaint "wholly fails to allege facts that would demonstrate an 'allowable' claim." Def.'s Mem. at 16. This argument appears to be another way of saying that the Committee has not established the existence of a creditor. This argument is dealt with at greater length elsewhere. The Committee has listed two creditors (the CCR and EPA) and a multitude of potential creditors (those who may have asbestos-related injuries) so that this Court cannot say at this juncture that the Committee has stated no facts to establish that there are in fact creditors.

asbestos-related tort liabilities because "[a]s the Committee has acknowledged in the G–I Holdings bankruptcy proceedings, such liabilities were held by a subsidiary of GAF, named GAF Building Materials Corporation ("GAF BMC")—a successor by merger to the asbestos liabilities of 'old' GAF." (Def.'s Reply at 7 n. 3). This argument fails at this stage because G–I has admitted in its 1996, 1997 and 1998 10–Ks that GAF was the respondent in tens of thousands of asbestos personal injury cases.

### D. Counts I and II State a Claim under the N.Y. DCL

 To prevail on any of its avoidance claims under § 544(b) the Committee must demonstrate that an actual unsecured creditor exists who could avoid the Transactions under New York law.[10] *In re 9281 Shore Road,* at 851–52; *In re Wingspread Corp.,* 178 B.R. at 946. The Committee alleges in Counts I through IV, respectively, that Heyman violated N.Y. DCL §§ 273, 274, 275, and 276.

Heyman argues that DCL §§ 273 and 274 apply only to creditors existing at the time of the transfer, not to future creditors, and that the Committee has failed to allege the existence of at least one unsecured creditor under New York law at the time the transfer occurred.

#### 1. Section 273 Requires a "Present Creditor"

 The language of § 273, as compared to §§ 275 and 276, reveals that its provisions are limited to unsecured creditors whose claim was in existence at the time of the allegedly fraudulent transfer.

---

*E.g., In re Manshul Construction Corp.,* No. 96844080, 2000 WL 1228866, at \*43–44 (S.D.N.Y. Aug. 30, 2000) (distinguishing standing requirements of DCL § 273 because it refers only to "creditors" rather than both creditors and future creditors). Claims under §§ 275 and 276 are explicitly enforceable by both "present and future creditors." DCL §§ 275, 276. By contrast, § 273 does not contain the "present and future creditors" language. Section 273 states that "[e]very conveyance made . . . by a person who is or will thereby be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made . . . without a fair consideration."

Because Count I is premised on § 273, the Committee "must demonstrate that there existed an actual unsecured creditor at the time of the transfer . . . whose shoes the trustee may step into so as to avoid the transfer under applicable state law." *In re 9281 Shore Road,* 187 B.R. at 851.

Heyman alleges that the Committee's complaint is devoid of allegations about how or when or in what amount the purported creditors' claims against GAF accrued, or that any of the asserted creditors existed at the time of the allegedly fraudulent conveyance. The Committee is correct in replying that Heyman asks too much at this point in the litigation.

To survive this motion to dismiss, the Committee need only have asserted facts that may entitle it to relief. The complaint states that CCR filed a timely lawsuit on September 18, 2000, claiming, *inter alia,* that GAF owed it $68 million at the effective date of the transfer.[11] In addition,

---

10. All parties concede that New York provides the controlling substantive law. Because Heyman is a New York resident and some of the injury took place in New York, this Court sees no reason to question the parties' choice of law. *In re Merritt Logan, Inc.,* 901 F.2d 349, 356 (3d Cir.1990).

11. As discussed above, Heyman's allegations about the lack of merit of the CCR complaint

approximately 59,600 claims against GAF were outstanding at the end of 1996, some of which, in all probability, remain outstanding. It does not appear beyond doubt that the Committee can prove a set of facts to entitle it to relief, and Heyman's motion to dismiss on this ground is denied.

### 2. Section 274 Does Not Require a Present Creditor

Section 274 states that "[e]very conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." DCL § 274. Section 274 "expressly state[s] that these remedies are for the benefit of creditors or persons who become creditors." *In re 9281 Shore Road Owners Corp.,* 187 B.R. 837, 851 (E.D.N.Y.1995); *see also Laco X-Ray Systems, Inc. v. Fingerhut,* 88 A.D.2d 425, 453 N.Y.S.2d 757, 762 (N.Y.App.Div. 1982) (stating § 274 applies to all existing creditors and persons who become creditors while business is in operation); *In re RCM Global Long Term Capital Appreciation Fund,* 200 B.R. 514, 523 n. 2 (Bankr. S.D.N.Y.1996) (noting that a creditor need not exist at the time of transfer under § 544(b) as long as the state statute allows it, and citing § 274 as an example of such statute).

Because CCR and likely some asbestos injury class members are present creditors and because § 274 does not require the existence of a present creditor in any case, Heyman's motion to dismiss Count II on this ground is dismissed.

### E. Count IV Was Pled with Particularity

Count IV alleges that GAF intended its transaction to defraud present and future creditors under DCL § 276.

Fed.R.Civ.P. 9(b) applies to claims of intentional fraudulent transfer. *Atlanta Shipping Corp. v. Chemical Bank,* 631 F.Supp. 335, 347 (S.D.N.Y.1986) (allegations of actual fraudulent intent under § 276 must plead the requisite mental intent with particularity). That rule requires plaintiffs to state the circumstances constituting the alleged fraud with particularity. Fed.R.Civ.P. 9(b). A defendant must be given sufficient notice of the time, place, and content of the alleged fraud because a defendant would be unable to prepare a defense properly without such notice. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994). In addition, plaintiff must allege facts that give rise to a "strong inference of fraudulent intent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993). A plaintiff's complaint may meet the requisite inference of fraud "either (a) by alleging facts to show that defendants have both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128 (citations omitted).

Courts have recognized that it is appropriate to be flexible in the particularity requirement of Rule 9(b) in the context of fraud claims brought by a statutory trustee in bankruptcy. Given the "inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party," courts have held the particularity requirement of Rule 9(b) may be relaxed. *Schwartz v. Kursman (In re*

are unavailing at this stage in the proceed- ings.

*Harry Levin, Inc. t/a Levin's Furniture),* 175 B.R. 560, 567–68 (Bankr.E.D.Pa.1994) (quoting L. King, 9 *Collier on Bankruptcy* ¶ 7009.05, at 7009–5 (15th ed.1994)). *See also In re American Spring Bed Mfr.,* 153 B.R. 365, 374 (Bankr.D.Mass.1993); *Pate v. Hunt (In re Hunt),* 136 B.R. 437, 452 (Bankr.N.D.Tex.1991).

Given this lenity, the complaint alleges sufficient facts to meet Rule 9(b)'s requirements. Plaintiff has stated the circumstances constituting the alleged fraud in this case in such a manner as to give Heyman sufficient notice of the time, place, and content of the alleged fraud. Indeed, Heyman cannot argue that he is unable to properly prepare a defense to plaintiff's allegations. Moreover, the Committee has alleged facts to give rise to an inference of intentional fraud. For instance, the transfer occurred mere months after the Supreme Court granted certiorari in *Amchem Products.* The Georgine Settlement was threatened, and Heyman recognized that in its absence the Asbestos Reserve was likely insufficient to accommodate the claims of litigants formerly cabined by the Georgine Settlement. The timing thus tends to suggest fraudulent intent, particularly given that the transfer was not for fair consideration and was made to a corporate insider.

Accepting the factual allegations set forth in the complaint as true, and drawing all reasonable inferences in favor of plaintiff, it does not appear beyond doubt that plaintiff can prove no set of facts in support of its causes of action that would entitle it to relief. Accordingly, Heyman's motion to dismiss Count IV pursuant to Rule 9(b) and Rule 12(b)(6) is denied.

## V. Breach of Fiduciary Duties Claims

### A. Count v. is Facially Sufficient [12]

■ Heyman argues that the plaintiff's allegation that GAF breached its fiduciary duties is insufficient to state a cause of action against Heyman.

■ Under New York law, the elements of a claim for breach of fiduciary duty are (1) existence of fiduciary relationship and (2) breach of a fiduciary duty. *Cramer v. Devon Group, Inc.,* 774 F.Supp. 176, 184 (S.D.N.Y.1991); *United Republic Ins. Co. v. Chase Manhattan Bank,* 168 F.Supp.2d 8, 15 (N.D.N.Y.2001). The Committee has adequately alleged that a breach of fiduciary duty existed because GAF either was insolvent or rendered insolvent by the transfer or was operating in the vicinity of insolvency at the time of or immediately after the transfer. *Credit Lyonnaise v. Pathe Communications,* 1991 WL 277613, at \*34 (Del.Ch.1991); *In re Buckhead America Corp.,* 178 B.R. 956, 968 (D.Del.1994). The Committee also alleged that the transfer violated GAF's fiduciary duty and that Heyman owed a duty to GAF's creditors as controlling shareholder. *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 84 L.Ed. 281.

Whether these allegations hold up are not for this Court to decide at this point. This motion to dismiss on this ground is denied.

### B. Count VI Is Not Facially Deficient

Heyman also alleges that plaintiff failed to meet the heightened pleading standard under Rule 9(b) for its claim that Heyman breached his fiduciary duty.

■ The particularity requirement of Rule 9(b) governs where, as here, a claim

---

**12.** Defendant originally argued that a three-year statute of limitations applies to Counts V and VI, which allege breach of fiduciary duty. Heyman withdrew that argument in its Reply Memorandum, however, and this Court finds no statute of limitation problem. See Def.'s Reply Mem. at 8 n. 5.

**38**

for breach of fiduciary duty is premised on alleged fraudulent conduct. *Thornton v. Evans*, 692 F.2d 1064, 1083 n. 43 (7th Cir.1992); *see also Isanaka v. Spectrum Technologies USA Inc.*, 131 F.Supp.2d 353, 361–62 (N.D.N.Y.2001) ("When a claim for breach of fiduciary duty is based primarily on alleged fraudulent conduct, the heightened pleading requirements of Fed. R.Civ.P. 9(b) apply.").

As discussed above in Part III, the Committee has met the minimal requirements of Rule 9(b). Heyman has sufficient notice of the allegations that he can proceed to develop a defense. Further, the allegations give rise to an inference of fraudulent intent. Heyman's motion to dismiss Count VI is therefore denied.

### Conclusion

For the foregoing reasons, Heyman's motion to dismiss is denied.

It is so ordered.